INSTRUMENT SYSTEMS CORPORA-
TION and Harold Beck

v.

The UNITED STATES.

Nos. 338–73 and 339–73.

United States Court of Claims.

Dec. 15, 1976.

358

Robert B. Yorty, Washington, D. C., attorney of record for plaintiffs; Lowell J. Bradford, Gordon W. Hatheway, Jr., and Pierson, Ball & Dowd, Washington, D. C., of counsel.

Gerald L. Schrader, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant; Don W. Crockett, Washington, D. C., atty., Renegotiation Bd., of counsel.

Before NICHOLS, KASHIWA and KUNZIG, Judges.

## DEFENDANT'S REQUEST FOR PROMPT REVIEW

NICHOLS, Judge:

■ These are petitions for redetermination by this court of the plaintiff's excessive profits received or accrued for its fiscal years ended July 31, 1967 and July 31, 1968, as determined by the Renegotiation Board under the Renegotiation Act of 1951, 50 U.S.C. App. § 1211 and ff. In the course of pre-trial proceedings a dispute has arisen concerning the scope of discovery allowable to the plaintiff. Trial Judge Louis Spector has issued, on February 13, 1976 an order with respect thereto, declined to reconsider it, on April 7, 1976, and refused to certify existence of "an issue of controlling importance or an issue involving deprivation of fundamental rights, as to which there is substantial ground for differences of opinion". Rule 53(c)(2)(i). Defendant has nevertheless requested review under the narrower subsection (ii) of the Rule. We deem that the standards of that subsection are met and therefore have decided to grant review, the fundamental rights of third parties as well as defendant's being involved in our opinion, and injury being threatened, which could not be corrected by any ultimate disposition of the case. Our statement of the issue and our conclusions follow.

The disputed order recites that plaintiff seeks to inspect and copy certain Forms RB–1 which, with attached schedules, were filed with the Renegotiation Board by competitors of the plaintiff, or companies which operated in a "related area". It seems to be agreed that only those are sought which concern years approximating the "review years" which ended respectively more than eight and nine years before this decision. The order states that Form RB–1 is "the last stage in the Board's long process of analyzing the underlying information which led to [the Board's] conclusions." The trial judge refers to this on reconsideration and possibly but ambiguously corrects the mistake. Actually, it is the first stage: the initial filing the Board uses to decide whether it will commence the renegotiation.

Called the "Standard Form of Contractor's Report" it is prescribed in RBR § 1470.3 and ff., 32 C.F.R. § 1470.3. Upon receipt of the RB–1 the Board decides whether to commence a proceeding, RBR § 1472.2. In cases the statute clearly does not cover, a "statement of non-applicability" is permitted in lieu of the RB–1. It is in either case a contractor's *ex parte* statement not yet corrected as the Board usually must do if it is to initiate a renegotiation, or if the decision whether to do so is at all a close one. Nevertheless, we will assume for purposes of our decision, at least, that access to the full RB–1's contemporary to the review years may possibly lead to the discovery of relevant evidence even if the forms themselves are not such relevant evidence. Rule 71(b)(1).

The order, however, asserts that the RB–1's are relevant evidence on the theory that comparisons with other individual companies are an indispensable part of renegotiation. We discuss this further below. As regards confidentiality, the order states that exemptions from disclosure under the Freedom of Information Act (FOIA) (5 U.S.C. § 552(b)(3) and (4) are presumably the parts referred to) are not necessarily for application in litigation where a need is demonstrated, relying mainly for authority on prior trial judge's decisions in this court. The order provides that the names of the contractors and other identifying details are to be excised and recites that counsel has agreed not to disclose the data to his client. "Any problems relating to the introduction of the data into evidence, will abide that event."

In connection with its request for review, and in oral argument, defendant advises that despite the exemption in the FOIA, supra, for:

(4) * * *

(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

the Board normally will furnish anyone on request the RB–1 with the contractor's name included; however, the columns for non-renegotiable and for total business (A and E) are masked out. Apparently, schedules and supporting tax returns, etc., are also not provided. By comparing and co-relating his discovery and his FOIA data counsel could make the deletion of the contractor's name and other identifying detail from the discovered RB–1's a meaningless ritual, and the reasons, except cosmetic, for requiring this, are far from obvious. Similarly, under the FOIA, anyone can obtain from the Board documents revealing the later history of the case the RB–1 started, with any errors in the financial data corrected, and with the Board's decision revealed, only the data as to non-renegotiable business being excluded as before.

This procedure does not originate in a mere whim of the Board, but reflects the outcome of litigation in the United States courts for the District of Columbia. *Grumman Aircraft Engineering Corp. v. Renegotiation Board*, 138 U.S.App.D.C. 147, 425 F.2d 578 (1970); *Fisher v. Renegotiation Board*, 153 U.S.App.D.C. 398, 473 F.2d 109 (1972), *on remand, Fisher v. Renegotiation Board*, 355 F.Supp. 1171 (D.D.C.1973); *Pacific Architects & Engineers, Inc. v. Renegotiation Board*, 164 U.S.App.D.C. 276, 505 F.2d 383 (1974). We do not have jurisdiction to review these or other FOIA decisions and do not do so. We assume that what the Board has done is what it had to do. If the reasonable expectations of privacy that contractors entertained, when they filed data with the Board, have been disappointed, this is the responsibility of the Congress that enacted the FOIA and the courts that interpret and apply it. However, we note that the companies who furnished the data were not so far as appears, parties to the above cited litigations. When such parties initiate litigation on their own account, to enjoin unauthorized administrative disclosure of their confidential financial and technical data, the FOIA takes on a different aspect. *Westinghouse Elec. Corp. v. Schlesinger*, 542 F.2d 1190 (4th Cir., decided September 30, 1976). The court therein notes that Government agencies having custody of confidential business data are not likely to be as effectual opponents of disclosures of it, allegedly but not really

required by the FOIA, as are the companies the disclosure will hurt.

In this instance the record does not reveal that the parties who supplied the involved RB–1 data have had any notice of the proposed use of the material they supplied to the Board, still less what their reaction would be, did they know. Defendant purports to speak as a surrogate on their behalf, also alleging that it will be unable to obtain willing compliance with the reporting requirements of the Renegotiation Act in the future. In view of the lapse of time, it is difficult to assess what the real or anticipated injury would be. Defendant does not purport to state the views of those actually concerned. It only proffers selected views of members of the defense contractor community, who may have filed RB–1s, but not the ones which would be divulged under the order here involved.

Reporting under the Act is clearly mandatory, and one who objected to disclosure of reports could make his objection fully effective only by rejecting defense business, if then. For one who decided on that drastic step the disclosure of reports could hardly be more than a minor factor, renegotiation itself would weigh more.

Defendant also complains of conflicting decisions by other trial judges in other cases. It is clear that unless we grant this review, and lay down a positive line, the discovery of renegotiation documents filed by or relating to contractors not before the court will vary widely according to which trial judge is assigned the case. We summarize the instances defendant relies on.

1. *Marinette Marine Corp. v. United States*, Ct.Cl., 546 F.2d 365. Plaintiff has petitioned for prompt review in that case, and it was argued immediately following the one at bar, before the same panel. It will be dealt with in an opinion issuing concurrently with this, and is referred to frequently hereinafter. Plaintiff demanded discovery of 27 RB–1s filed by its competitors in the shipbuilding industry. Trial Judge Miller required defendant to communicate with the companies involved. Their responses in several instances included for-

mal motions for protective orders. Others just objected by letter. Some did not respond and some waived objection. The objectors in several instances were apparently unaware that, except for data as to non-renegotiable business, plaintiff already had access to their filings via the FOIA, without their having anything to say about it. The trial judge refers to defendant's "error" in not excising names and identifying details, as if defendant had any option in the matter. He seems to feel that defendant voluntarily elected a course of action that might lead to limitations on discovery here, not otherwise necessary. He allows the discovery; however, he requires plaintiff's counsel to return his FOIA material with respect to any filing as to which he is allowed discovery here. The names and other identifying details are to be excised; counsel is not to disclose data to his client, but only to his accountant and his "assistants," which term apparently may include retained expert witnesses. Parts of the order deal with other matters and are left to the other opinion.

2. *Major Coat Co. v. United States*, No. 31–72. Trial Judge Willi held, on November 21, 1973, that the Government was not the owner of the RB–1 material, but only a bailee or custodian. If plaintiff wanted discovery of it, beyond the FOIA limits, it would have to pursue discovery directly with the filing contractors. Defendant submits that this is the correct position. We note that the court has now decided this case on the merits. Ct.Cl., 543 F.2d 97 (1976). Some comparable companies are referred to by name; how the data was obtained is not spelled out. The court complains that the comparative data is inadequate. We discuss this highly significant decision further on, as. to other aspects.

3. Shortly after Trial Judge Willi's above decision, Trial Judge Schwartz took the opposite point of view in *Consolidated Box Co. v. United States*, Ct.Cl., 538 F.2d 348, and later on, in *Menominee Engr. Corp. v. United States*, No. 214–74. He holds that a document is not immune from discovery because it is confidential. He

weighs the plaintiff's need, which he finds great, against the possibility of injury, which he finds unimpressive in view of the age of the material. He notes that none of the filers of RB–1's here intervened. He presumes that defendant has either advised such parties that they may intervene, and none have chosen to do so, or that defendant has concluded it could not expect support from that source. In view of the responses obtained in the *Marinette* case, such presumptions appear unrealistic. Defendant clearly thinks that if anyone is to notify the other contractors, it should be plaintiff. That was its retreat position here, if we rejected the Willi view. Judge Schwartz requires counsel not to disclose the data to his client, or to others than his accountant and "assistants". The names and other identifying details are to be excised. This last would appear to be no more than cosmetic in view of the availability of the FOIA data, which counsel is not required to surrender.

On oral argument, defendant admitted that its long-range policy was to keep out of our renegotiation cases entirely, all use of specific third party company data for comparison purposes. This, although it cannot be denied that the Board uses them extensively, as its regulations in many places disclose. Defendant would have the court use, instead, composite data assembled by the IRS or otherwise.

As noted in *Aero Spacelines Inc. v. United States*, 530 F.2d 324, 208 Ct.Cl. 704 (1976), the Tax Court before the transfer of cases here insisted on meaningful comparative data. We have repeatedly complained of the absence or thinness thereof in the cases that have come before us on the merits. *Aero Spacelines, supra; Major Coat Company, supra; Butkin Precision Mfg. Co. v. United States*, Ct.Cl., 544 F.2d 499 (decided October 20, 1976). In *Aero*, 530 F.2d at 340–41, 208 Ct.Cl. at 730, we said:

Despite the importance of meaningful comparative data, neither party to this suit has made a significant effort to bring such information before the court. The absence of helpful comparisons char-acterized both plaintiff's prima facie case and the Government's response. The defendant, which bears the ultimate burden of proving both the existence of excessive profits *and the extent of those profits* necessarily fares worse than does plaintiff for lack of this information. (Emphasis in original).

The insufficiency of comparison with composites has been emphasized almost as often. This topic is stressed in *Major Coat* and *Butkin*, both *supra*. In *A. C. Ball Co. v. United States*, 531 F.2d 993, 209 Ct.Cl. 223 (1976), the composite statistics on salaries paid executives in "comparable industry" were held to have "only limited applicability", in determining the reasonableness of executive salaries in the company under review, in a case where such salaries were a vital and determinative issue.

We think that after study of our latest cases, defendant will likely conclude that the goal of substituting composite comparisons for individual ones is not attainable and that the outcome of persisting in it is likely to be as in *Aero Spacelines* and *Butkin*, that defendant will be held not to have sustained its burden of proof that any excessive profits at all were realized in the years under review.

It may clarify thought to remind lawyers of something they all are familiar with: the use of sales of comparable property to determine in legal proceedings the fair market value of real estate. Would it be accepted as rational to assemble a lumped average composite of sales of homes, apartment houses, office buildings, garages, churches and warehouses, and offer that as a substitute for even one simple sale that actually took place in the real world? Would it be reasonable to offer the sale of any single building with the identity and location of it blanked out?

On the other hand, it is necessary to prevent the renegotiation of one contractor being magnified by counsel into the renegotiation of all its competitors. Once the most immediately relevant data of the other case is at hand, inquiry into all its ramifications must be resolutely halted.

We also note that the plaintiffs here involved, in their persistent demands for discovery over and above the liberal FOIA standard, seem to disbelieve that this court meant anything significant in *Lykes Bros. S. S. v. United States*, 459 F.2d 1393, 198 Ct.Cl. 312 (1972), wherein we said that defendant bore the ultimate burden of proof, but the contractor had the initial burden of going forward, with proof of a prima facie case (after the accounting data was established) as to the statutory factors on which it relied, with proof of facts within plaintiff's knowledge, or accessible to the public generally in the form of published reports, or voluntarily made available by the Government through a request in pre-trial proceedings, or by discovery through the court rules, or pursuant to FOIA.

■ It was not our intention, of course, to say that the prima facie case was the same as a complete and entire case, so that the burden of proof on plaintiff to make its prima facie case was the same as the complete burden as it was in the Tax Court. If this had been our intention, there would have been no point in the preliminary deliberations, whether we should adhere to or abandon the previous Tax Court rule. Rather our idea was that while throwing the burden on defendant, we should require plaintiff to show that it had acted responsibly in invoking the processes of this court, and not just for purposes of delay. Since plaintiff had chosen whether this court should function in the premises or not, we thought a modest showing of probable cause was reasonable. In *Aero Spacelines* and *Butkin, supra*, we have established lenient standards as to what constitutes a prima facie case. We certainly did not envisage that, to make a mere prima facie case, plaintiffs would have to embark on bitterly contested moves to infringe or reduce the legally protected privacy of parties not involved in the litigation in this court. To make the matter completely clear, we now determine that a mere prima facie case, sufficient within the meaning of the *Lykes* case, need not include data as to the business of third parties to the litigation, outside that available to all under the

FOIA. Plaintiff may accept as correct part of the Board factor analysis, as to some factors, and show that the Board has done injustice with respect to others, thus stressing what the contractor best knows, its own business.

It is reasonable to suppose that in view of the foregoing, the sense of urgency on the part of defendant to exclude all specific comparisons from the case will be diminished, and it may realize its own need for such comparisons, to sustain its burden of proof. On the other hand, plaintiffs may be more satisfied with their FOIA material and may be content to await what else, if anything, defendant brings forth. Any rule we lay down should be written in anticipation of this possible future situation, and not deal merely with the stands of the parties that confront us now.

At the outset we are constrained to observe that the cold RB–1 as set forth in RBR § 1470.90(c), whether or not mutilated by deletion of non-renegotiable and total business data, will not normally provide a comparison to set against the contractor under review, in and of itself. It is obviously not intended for anything but preliminary screening. It does not afford any basis for an opinion as to how the filing party would compare with any other company under the factors, taken separately. Thus if the filing party made, e. g., a creditable contribution, or suffered losses after the year under review (*cf. Butkin, supra*) there is no place on the form to show it. It seems clear, therefore, that for our present purposes, the RB–1 is more a lead to the discovery of meaningful comparisons, than the basis of such comparisons itself. It is reasonable to suppose that any selected comparison company will be similar as to some factors and different as to others. To make a meaningful comparison, it will be necessary to point out the similarities and to discount the differences. A comparison that does not do this is bound to be just as superficial as the composite comparisons we have already discussed.

The financial data on the front of the RB–1 lumps together all the products the

company produces. Only on the back, in Sec. IX is a breakdown by product asked for, but it is plainly of the most superficial character.

The mutilation of the form by deletion of the non-renegotiable and total columns, (A and E) will have an entirely different impact on the informativeness of the filing, depending on whether the party has significant non-renegotiable business or not (many do not) and, if it does, whether it is a matter of different products, made in different plants, or the same products, made in the same plants. When, as so often, volume and its war-caused increase or decrease is a significant factor in the decision, the elimination of the non-renegotiable sales of a principal renegotiable product, will be a crucial mutilation. When the same plant produces different products, determining the cost of one as against the other is an eminently inexact science, and the allocation of costs and profits, among these products may be an object of some scrutiny, even if the RB–1 is prepared by independent CPA's of high repute. The contractor is therefore required to reveal the method of allocation, but if one cannot see and compare the costs and profits actually allocated to each segment, it is impossible to draw any but superficial conclusions.

Similarly, and for similar reasons, assuming that columns B, C and D are made available to the public, with whatever injury caused thereby left without a remedy, how much additional harm is caused by revealing columns A and E, and certain schedules, or saved by not doing so, will not be uniform but will vary widely from case to case.

The excising of the name and other "identifying details" would seem to frustrate the use of the RB–1 as a lead to other evidence, the principal use it would appear to have. And whether the mutilation serves any protective purpose is open to doubt. Clearly none, if the discovering party can use its FOIA material to complete its identifications of RB–1's with only identification concealed, as in the order immediately before us. It is to be supposed that even

without this help, in many industries, contractors know enough about their competitors to recognize their financial data. It displays commendable faith to tell counsel he cannot disclose the material except to his accountant and his "assistants", but none of the orders we consider deal with what may happen if the material is offered in evidence at the trial. Is the client to be excluded from the courtroom? Our trial judges all agree in deferring consideration of this problem until it arises. No doubt this reflects wise statesmanship, but one who is started walking down the plank may wish to know what happens if he falls into the water.

■ Agreeing as we do with our trial judge that the decision respecting discovery is to be made by balancing need for evidence against threatened injury to the third party, and that the contractors' reasonable expectations of confidentiality, when they filed their RB–1's, are entitled to be considered but are not necessarily controlling here, and agreeing further, that the long lapse of time between filing of a third party's RB–1, and its use here, must notably diminish the likelihood of such injury, we are constrained to disagree that the matter is susceptible to handling by any across the board order, no matter how astutely framed. It demands case by case consideration in which the party who filed the RB–1 has a right to be notified and to be heard, and unless he consents to the disclosure, the balancing of necessity and injury is made with respect to the individual RB–1, not with respect to all of them as a class. If our analysis of the situation has any validity at all, it establishes that the factors of necessity and injury will not be the same for all RB–1s, but will vary wildly from one to another.

■ Since we anticipate that defendant will wish to make comparisons in future cases, any procedure we prescribe should not give defendant any unfair advantage resulting from having custody of all RB–1s in Government files. It has raised serious questions as to privacy rights, seeking to speak as surrogate for parties not before us,

except in the *Marinette* case, where we have several petitions by third parties for protective orders. It must respect these rights equally with its adversary.

It is also realistic to recognize that in many or most instances the information in the RB–1s, and whatever other information they lead to, will not go in evidence directly, but will be filtered through the minds of expert witnesses in course of preparing their testimony.

 In light of the foregoing, we think a proper procedure in the premises will consist of the following elements:

A. If either party believes that use of third party renegotiation documents, not otherwise available is necessary, for discovery, trial preparation, or evidence, it shall advise the trial judge, who shall make an appropriate order. Such order shall assure that any such documents available to and used by one party, shall be available before trial to the other for similar use.

B. The said order shall include proper provision for notification of third parties, to be given by the party desiring the discovery, etc. This notice shall explain clearly the scope of FOIA access, which does not depend on the addressee's consent. (Trial Judge Miller notes in *Marinette* that several respondents seemed unaware of the extent of FOIA access and therefore they probably did not consider adequately whether the proposed discovery would inflict any injury additional to what they had already suffered.) The notice should also identify the year or years involved, and might point out the lapse of time. Of course, it should clearly identify the documents to be discovered or used. The notice should also state that in case of objection to disclosure, in full or in part, a mere letter so stating, signed by an officer of the company, and received within a specific time, will suffice, and will be taken as a tentative motion for a protective order with amplification later on being allowed if needed. (The notice in *Marinette* in several instances elicited full, formal motions for protective orders, prepared by company house counsel or Washington counsel. This probably involved unnecessary expense and inconvenience to the third parties, and may have led them to take more extreme and uncooperative positions than they otherwise would have done.) Non-response may be taken as acquiescence.

C. When the third parties have responded or allowed the allotted time to pass without response, the requesting party may decide to be satisfied with the RB–1s of those who have not objected, in which case the trial judge would have no problem. If the filings of objectors are still demanded, such objectors shall be notified again and afforded a chance to formalize their objections into regular motions under Rule 71(f), to file affidavits and briefs, and in exceptional cases to make oral arguments, to which of course the parties may respond. The trial judge must balance the necessity and injury on a case by case basis, examining documents *in camera* at his discretion. An attitude of some skepticism on his part as to both necessity and injury would be appropriate, we think, with the burden of proof put on the party asserting either, and he must not forget the high regard this court has for comparison evidence. We suspect, however, that the issue now before us is much overblown: that assuming the present scope of FOIA discovery, in most cases the added material on non-renegotiable business will be neither necessary nor injurious, under all the circumstances. In general, we think a remedy by mutilating the filing in some manner other than the FOIA manner is not advisable, though we do not rule it out entirely, especially if it is the means of obtaining a stipulated settlement of the issue. Attachments to the RB–1, specified therein, are of course parts of the form, see, *e. g.*, Secs. II, III, VII, VIII, and need not be discussed separately. Other material, furnished with the form voluntarily, may receive more lenient consideration. We do not think the furnishing of tax returns is really voluntary in light of line 7 and the Board procedure as we understand it, and we would discover tax returns only with great reluctance.

If any disputes arise about discovery of documents generated during and at the end of the renegotiation, what we have said can be applied by analogy.

We recognize that this procedure could impose too heavy a burden on the Trial Division. If it does, it will have to be reconsidered. We would hope the added burdens also thrown herein on the plaintiff, the defendant, and the third parties, will cause all of them to consider what their real interests are, what concessions they can afford to make, and whether the further brewing of tempests in teapots is really advisable.

In view of the foregoing, the order under review is vacated, and the cause is remanded to the Trial Division for further proceedings consistent with this opinion.