### WELLS MARINE, INC. (d/b/a Z–D Products)

v.

### The UNITED STATES.

### Nos. 577–71, 135–72.

United States Court of Claims.

March 24, 1982.

Kevin O'Connell, Los Angeles, Cal., for plaintiff. Thomas R. Sheridan, attorney of record, Simon & Sheridan, and Michael R. Rogers, Los Angeles, Cal., of counsel.

Elizabeth Langer, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul McGrath, for defendant. Gerald D. Freed, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and KUNZIG * and BENNETT, Judges.

## OPINION

FRIEDMAN, Chief Judge:

The plaintiff in this renegotiation case challenges a recommended decision of Trial Judge Miller that it had excessive profits of $203,349 and $1,360,000 for its fiscal years 1966 and 1967, respectively. The trial judge has written a careful, detailed, and incisive treatment of the case. His analysis of both the facts and the legal issues has been most helpful to us, and we have drawn heavily upon it. We reach a conclusion different from his, however.

We hold that the defendant failed to carry its burden of proof that the plaintiff's profits for those years were excessive. We so conclude because the defendant did not introduce the comparative evidence concerning the plaintiff's profits in relation to the profits of its competitors that our decision in *Major Coat Co. v. United States*, 211 Ct.Cl. 1, 543 F.2d 97 (1976), required it to present. We therefore grant the plaintiff a clearance.

I.

The plaintiff was incorporated in 1965 for the purpose of producing fuzes for 20 mm. explosive ammunition, used on aircraft-mounted machine guns in the Vietnam War. The plaintiff's founder and sole stockholder during the review years, Samuel Horowitz, had constructed such fuzes for the government during both World War II and the Korean War. When the Vietnam War escalated, the government was in short supply of fuzes, and Horowitz, who was not then in the business, decided to try to reenter it. In less than a year, Horowitz obtained factory space, scoured the country for old machines, rebuilt them, obtained financing, and performed an experimental contract.

In March 1966, following competitive bidding, Horowitz was awarded a contract to produce 5.6 million fuzes at 39.5 cents per fuze, for a total of $2,212,000. There were 14 bidders, two of which the government disqualified because they could not meet the delivery schedule. The government divided the total procurement for these fuzes among the five lowest bidders. There were four contractors that bid upon only the production of the fuzes; the fifth successful bidder also assembled and loaded the fuzes. The plaintiff was the highest bidder of the four. The plaintiff's share of the total procurement was 28 percent.

The contract authorized the government to obtain additional fuzes. In August 1966, the government ordered from the plaintiff an additional 2.8 million fuzes which, at a unit price of $.3943, came to an additional $1,003,040.

In October 1966, the plaintiff was one of nine firms that submitted bids on an additional fuze procurement. The government selected six of the bidders and entered into contracts with them. Once again, the plaintiff's price was the highest among the five bidders that undertook only to manufacture the fuzes. The plaintiff received a

---

* Before he died, Judge Kunzig participated in the oral argument and agreed with the decision in this case.

contract to produce 9 million fuzes at 37.15 cents each for a total price of $3,343,500. The government subsequently exercised its option under the contract to increase production and gave the plaintiff an order for almost 4.2 million additional fuzes.

Following its receipt of this contract, between 1967 and 1971 the plaintiff bid upon eight other fuze contracts. Only once, however, was its bid low enough to prevail. That was in February 1967, when the plaintiff received a contract to produce 4 million fuzes at 14.5 cents each, for a total price of $580,000.

In 1967, after competitive bidding, the government also awarded the plaintiff contracts to produce other war materiel. The amounts the plaintiff received under these contracts constituted only 2 percent of the plaintiff's total 1967 sales, and we therefore shall disregard them.

In 1966, the plaintiff had profits of $498,463 on fuze sales of almost $1.9 million. The plaintiff had fuze sales of approximately $5.8 million in 1967, and the parties disagree on the amount of profits. The plaintiff contends it had profits of $1,068,519, while the government argues that the profits were $1,928,291. The trial judge agreed with the government. In view of our disposition of the case, however, we need not decide the question.

## II.

Prior to 1971, the Tax Court had exclusive jurisdiction over renegotiation cases. 50 U.S.C. App. § 1218 (1970) (amended 1971). In that court the contractor generally was required to prove that it had not realized excessive profits. *Page-River-Curran v. Renegotiation Board*, 55 T.C. 1153, 1154 (1971); *Grumman Aircraft Engineering Corp. v. Renegotiation Board*, 52 T.C. 152, 154 (1969); *Cohen v. Secretary of War*, 7 T.C. 1002, 1010–11 (1946). When that jurisdiction was transferred to this court in 1971, Act of July 1, 1971, Pub.L.No.92–41, § 3(a), 85 Stat. 97, 98, however, we adopted different rules regarding the burden of proof.

In our first renegotiation decision, *Lykes Brothers Steamship Co. v. United States*, 198 Ct.Cl. 312, 459 F.2d 1393 (1972), we announced a bifurcated procedure for these cases:

A. The contractor has the initial burdens of (1) proving the accuracy of the financial data (if there is any dispute about such data), and (2) going forward with proof concerning the statutory factors under the Renegotiation Act, 50 U.S.C. App. § 1213(e) (1976), upon which it relies. These are various factors such as reasonableness of costs and profits, efficiency, extent of risk assumed, etc., that the Act requires to "be taken into consideration" in determining excessive profits. "Normally, when the contractor does this, it will have made a prima facie case, i.e., a showing which, unless rebutted, would justify a judgment in accord with the contractor's contentions." *Lykes*, 198 Ct.Cl. at 327, 459 F.2d at 1401. If the plaintiff does not establish a prima facie case, there is no basis for rejecting the determination of the Renegotiation Board that the plaintiff had excessive profits. *O'Brien Gear & Machine Co. v. United States*, 219 Ct.Cl. 187, 591 F.2d 666 (1979); *Manufacturers Service Co. v. United States*, 217 Ct.Cl. 387, 398, 582 F.2d 561, 568–69 (1978).

B. "[W]hen plaintiff has met the requirements stated above, the burden shifts to the Government to prove that plaintiff's profits were excessive and the extent thereof. This encompasses not only the burden of going forward with evidence after plaintiff's case in chief is closed, but also the burden of persuasion." *Lykes*, 198 Ct.Cl. at 327, 459 F.2d at 1402 (footnote omitted). The result is "to place upon the Government the burden of proving, by a preponderance of the evidence, that the plaintiff realized excessive profits, as well as the amount of such excessive profits." *Id.* at 330, 459 F.2d at 1403.

C. Subsequent to *Lykes*, the court stressed that evidence comparing the particular contractor's prices, costs, and profits with those of its competitors is the most reliable, probative, and important evidence

in determining whether profits are excessive. *A. C. Ball Co. v. United States,* 209 Ct.Cl. 223, 264–65, 531 F.2d 993, 1016 (1976); *Aero Spacelines, Inc. v. United States,* 208 Ct.Cl. 704, 729–30, 752–53, 756–57, 530 F.2d 324, 340, 353–54, 355–56 (1976). In *Major Coat,* we explained the reasons why comparison of the plaintiff's profits and performance with those of its competitors is the key element in determining whether a contractor's profits are excessive—the issue on which under *Lykes* the government has the burden of proof.

We noted that determination of excessive profits involves an "essentially comparative process by which a reasonable level of profit is determined" based upon a "meaningful comparison of the contractor's review year business and performance with that of firms functioning in a competitive market." 211 Ct.Cl. at 9–10, 543 F.2d at 102. We explained that the rationale of renegotiation is that the government's sudden need for substantial quantities of military materiel deprives it of the ability and opportunity to engage in the bargaining and negotiation that normally characterize government procurement. The result is the "evaporation of price competition, and the consummation of sales to the defense agencies much higher in price than a competitive market would have allowed. The Government thus relies upon the expedient of renegotiation to recoup the price differential." *Id.* at 23, 543 F.2d at 110 (citation omitted). "Renegotiation merely seeks to reconstruct the competitive price to the Government, and the competitive profit for the contractor, that negotiation would have produced absent the suddenness of the wartime demand on the marketplace." *Id.* at 24, 543 F.2d at 110.

We stated that the evidence relating to the statutory factor of "[r]easonableness of costs and profits" should

identify (a) the firms whose size, products, and overall business operations were, in the time frame of the review period, sufficiently similar to plaintiff's that they may be considered "comparable," (b) the extent of that similarity, and (c) the comparable firms' profits in that time frame. The gathered data should disclose the full range or hierarchy of profits in the renegotiated contractor's industry, with which plaintiff's profits may be compared to ascertain whether they are excessive, and if so, by how much.

*Id.* at 25, 543 F.2d at 111.

The court further pointed out that another statutory factor, "efficiency," requires comparing the efficiency of the contractor and that of his competitors. "[A]ll ... aspects of efficiency are to be noted for plaintiff and for each firm with which it is compared in order to assess their efficiencies relative to one another." *Id.* at 35, 543 F.2d at 116. The court also noted that another of the statutory factors, "extent of risk assumed," also requires "consideration of the risks borne by the renegotiated contractor and comparable firms." *Id.* at 36, 543 F.2d at 117.

In the penultimate paragraph of our opinion, we recognized that "[r]enegotiation law is at an early stage in its development in this court." *Id.* at 48, 543 F.2d at 124. Because the court was still "enunciating standards to guide the location and the weighing of" "the kind of proof required to make a convincing case one way or the other," the court undertook

however reluctantly, and for only a limited span of time, to engage in judgmental adjustments and reworkings of the data placed in the record in order to arrive at a finding of a reasonable profit for the renegotiated contractor—where the state of the evidence permits this to be done in a responsible manner, consistent with the purposes of the Act.

*Id.,* 543 F.2d at 124.

Since *Major Coat,* the court has reiterated the need for the government, in order to sustain its burden of proof that a contractor has realized excessive profits, to introduce comparative evidence. *E.g., Kay Manufacturing Co. v. United States,* 676 F.2d 555 at 558, 563 (Ct.Cl.1982); *Manufacturers Service,* 217 Ct.Cl. at 412 n.28, 582 F.2d at 577 n.28 ("[D]efendant escapes the harsh judg-

ment of a clearance—because of failure to provide some sort of meaningful comparative data—because this case was tried prior to the more explicit decisions of this court explaining the need and calling for such comparative information"); *Instrument Systems Corp. v. United States*, 212 Ct.Cl. 99, 107, 546 F.2d 357, 361 (1976); *cf. Shinn Engineering, Inc. v. United States*, 221 Ct.Cl. 708, 719, 611 F.2d 820, 826 (1979) ("[T]he statutory factors must, to be useful, be evaluated in a comparative approach"). *See also Shinn Engineering*, 221 Ct.Cl. at 733–35, 611 F.2d at 833–34 (Kunzig, J., dissenting).

Of course, there may be situations where the government cannot produce evidence comparing a contractor and his competitors, such as where the contractor is unique. In those situations the court has accepted comparisons between the contractor's business in the renegotiable years and in other years, and between the contractor's renegotiable and nonrenegotiable business. *Simmonds Precision Products, Inc. v. United States*, 225 Ct.Cl. ——, ——, 640 F.2d 292, 311 (1980). Moreover, in cases tried before *Major Coat* in which the government had not introduced comparative evidence, we have determined ourselves whether the profits were excessive on the basis of the other evidence in the record—as we indicated in *Major Coat* we would do "for only a limited span of time." *E.g., Shinn Engineering*, 221 Ct.Cl. at 716–17, 611 F.2d at 824; *Manufacturers Service*, 217 Ct.Cl. at 405–06, 582 F.2d at 573.

In our most recent renegotiation opinion, *Kay Manufacturing*, we reversed a trial judge's recommended decision that the plaintiff had realized excessive profits. We took that action because the government had not carried its burden of proof. We concluded our opinion with the following statement:

> Defendant has fallen far short of providing the kind of hard evidence that would enable us to determine what portion, *if any*, of plaintiff's profits were unreasonably high. Although the type of "judg-

mental adjustments and reworkings of the data" engaged in by the Trial Judge may have been permitted (though not encouraged) by our 1976 decision in *Major Coat*, it cannot be said that the five-year transition period (which the government has now reveled in long enough) has been too short. The implications were clear in 1976; the court will no longer carry defendant's burden in 1982. The "limited span of time" granted by our *Major Coat* decision is at an end.

At ——, 676 F.2d at 566 (emphasis in original).

## III.

■ Applying these principles to this case, we conclude that the plaintiff established a prima facie case but that the government failed to carry its burden of proof that the plaintiff realized excessive profits.

■ A. The court has "established lenient standards as to what constitutes a [contractor's] prima facie case." *Instrument Systems*, 212 Ct.Cl. at 108–09, 546 F.2d at 362. A contractor need not present evidence on all the statutory factors, but only on those where the evidence is favorable to it. *Id.* at 109, 546 F.2d at 362. The contractor is required only to "show that it had acted responsibly in invoking the processes of the court, and not just for purposes of delay." *Id.* at 108, 546 F.2d at 362. The purpose is "largely to safeguard . . . [the government] against being surprised." *Butkin Precision Manufacturing Corp. v. United States*, 211 Ct.Cl. 110, 131, 544 F.2d 499, 511 (1976). Once a contractor has presented credible evidence, it "has established a prima facie case within the meaning of the *Lykes* decision." *Aero Spacelines*, 208 Ct.Cl. at 759, 530 F.2d at 357. The only time the court found that a prima facie case was not made was when the contractor's evidence was fraudulent. *O'Brien.*

The plaintiff presented evidence on all the statutory factors, 50 U.S.C. App. § 1213(e), but it relied most heavily on Horowitz's expertise, his efforts in finding and rebuilding the machines, the speed with

which the business was formed, the risks Horowitz took in setting up the business, and the number of fuzes produced. The trial judge gave the plaintiff a credit of $200,000 for the statutory factor of "risk assumed," but no credit for any of the other factors. The trial judge did not directly address the question whether the plaintiff had satisfied its burden of proof. We hold that under the foregoing standards, the plaintiff carried its burden of establishing a prima facie case.

B. 1. Although this case was tried in 1978, almost two years after *Major Coat* was decided, the government did not introduce any comparative evidence relating to the plaintiff and the other firms in the industry. As the trial judge pointed out, "[d]efendant has never explained why it did not produce such comparative profit data, nor has it asserted that such data was unavailable." Indeed, the pertinent regulations in effect at the time of the trial mandated that "[c]omparisons will be made with the contractor's own costs and profits in previous years and with current costs and profits of other contractors, if such information is available." 32 C.F.R. § 1460.10(b)(1) (1978).

The plaintiff was one of 12 bidders when it received its first contract in 1966, and one of nine when it received its second contract later in that year. The plaintiff was one of five successful bidders on the first contract and one of six successful bidders on the second procurement. Moreover, in subsequent years the plaintiff bid on eight other fuze contracts but was awarded only one. The record leaves no doubt that there were a large number of firms actively engaged in the fuze manufacturing industry.

In its brief, the government for the first time attempted to justify its failure to offer comparative evidence. The reason, it stated, was because the fuze market was noncompetitive, so that comparisons between the plaintiff and other firms in the market would be useless. It pointed to our statement in *Major Coat* that "[a] practice of measuring the reasonableness of a contractor's profits against the noncompetitive profits of others is too futile to warrant

condemnation." 211 Ct.Cl. at 26, 543 F.2d at 111.

The government has not established the factual premise of its argument, namely, that the fuze market was noncompetitive. The government did not introduce any expert testimony or evidence concerning the competitive state of the market, such as the views of a qualified economist. In fact, the record contains substantial evidence that the market was vigorously competitive in those years.

In its first 1966 solicitation for bids on fuzes, the government sought bids for 20 million fuzes and received 12 proposals from qualified bidders offering to produce a total of almost 80 million fuzes. In its second solicitation in that year, the government sought bids for 40 million fuzes. Nine qualified producers offered proposals for a total of almost 150 million fuzes. In the next five years, the plaintiff was awarded only one contract out of eight on which it bid because others had underbid it. The Chief of the Ammunition Procurement Division at the Frankford Arsenal stated in a deposition that there was "adequate price competition" on the 1966 and 1967 contracts.

The evidence upon which the government relies to support its assertion that the market was noncompetitive is unconvincing. The government points out that there was a critical shortage of fuzes at that time and a sky-rocketing demand, that the prices the government paid under all of its contracts in 1966 and 1967 were at an all-time high, and that by 1971, when the demand had slackened, fuze prices had dropped drastically. The government also refers to the trial judge's comment that it is reasonable to believe that all of the plaintiff's competitors had inflated prices.

Even if all the firms in the fuze industry had inflated prices, that would not necessarily establish that the market was noncompetitive. The evidence shows that within that market numerous firms were vigorously competing, on a price basis, for the available business. Many of the firms who competed did not receive contracts because their prices were too high. There

would have to be far stronger evidence than what the government points to in this case before we could conclude that in 1966 and 1967 the fuze market was noncompetitive so that comparative evidence would be irrelevant.

2. The trial judge, however, was of the view that the government's failure to introduce comparative evidence was not fatal to the government's case. He stated: "The absence of such data 'simply leaves the Government to meet its burden, if it can, with other proof,'" *citing Manufacturers Service,* 217 Ct.Cl. at 405, 582 F.2d at 573.

*Manufacturers Service,* however, was tried before *Major Coat* was decided. The statement the trial judge quoted merely reflected our willingness to accept for a limited time other evidence in such cases. *Cf. Kay Manufacturing* ("The 'limited span of time' ... is at an end"). That was the situation in *Shinn Engineering,* also tried before *Major Coat,* where we made our own determination of excessive profits despite the government's failure to introduce adequate comparative evidence.

In *Simmonds Precision Products,* in holding that the government had shown excessive profits even though it had not introduced comparative evidence, we stated: "*Major Coat,* however, was not written to prescribe use of one single method of proving excessive profits and bar all others." 225 Ct.Cl. at ——, 640 F.2d at 302. That statement, however, must be read in light of the case before the court, in which no meaningful comparison between the plaintiff and other firms was possible because the plaintiff was "the sole supplier of the aluminum magazine, a unique component." *Id.* at ——, 640 F.2d at 302.

3. We recognize that in relation to its sales, costs, and other factors that may be relevant in determining excessive profits, the plaintiff's profits were large. The trial judge concluded, based upon his own evaluation of the evidence, that the plaintiff had substantial excessive profits. Under *Major Coat,* however, the government does not sustain its burden of proof unless it introduces comparative evidence where such evidence is available, meaningful, and relates to a competitive market.

The present case does not present any factors warranting a departure from that principle. The government's failure to carry its burden of proof under *Major Coat* entitles the plaintiff to a clearance.

### CONCLUSION

For its fiscal years 1966 and 1967, the plaintiff realized no excessive profits on its renegotiable business. The defendant's counterclaim is dismissed. The plaintiff is entitled to a refund of all monies paid to defendant, if any, as excessive profits, together with interest as provided by the Renegotiation Act of 1951, as amended.