SIMMONDS PRECISION PRODUCTS, INC. Successor in interest to Universal Industries, Inc.

v.

The UNITED STATES.

No. 487–73.

United States Court of Claims.

Dec. 3, 1980.

Thomas A. Schmutz, Washington, D.C., for plaintiff; Loren K. Olson, Washington, D.C., attorney of record; Morgan, Lewis & Bockius, Washington, D.C., of counsel.

Glenn E. Harris, New York City, with whom was Asst. Atty. Gen. Alice Daniel, Washington, D.C., for defendant.

Before NICHOLS, KASHIWA and SMITH, Judges.

## OPINION

PER CURIAM:

This case is before the court on plaintiff's and defendant's exceptions to findings of fact and recommended decision dated September 28, 1979, and submitted by Trial Judge Colaianni in accordance with Rule 134(h). The petition was for redetermination *de novo* of a unilateral determination by the former Renegotiation Board under 50 U.S.C.App. §§ 1212–18, *as amended.* Universal Industries, Inc. is called "plaintiff" and was the contractor. Simmonds Precision Products, Inc. prosecutes this case as its successor. The board ordered elimination of excessive profits on defense contracts and subcontracts, received or accrued by plaintiff's predecessor in interest, Universal Industries, Inc., of $250,000 for its fiscal (calendar) year 1966, and $550,280 for its short fiscal year ended August 15, 1967, both figures before adjustment for state taxes measured by income, and subject to the applicable credit, if any, for federal income taxes. Plaintiff filed a bond in this court to stay collection of the board order and defendant counterclaims for $800,000.

Upon consideration of the briefs and oral argument of the parties, the court agrees with the said recommended decision, as hereinafter set forth. It affirms and adopts the said decision, as modified by the trial judge in his supplemental opinion of October 1, 1979, as the basis for its judgment in the case. However, some comment by us is in order to respond more specifically to some of the arguments made by the parties to us.

The trial judge recommends and we agree, that plaintiff should be determined to have realized no excessive profits in its 1966 year and but $183,762 in 1967, allowing as nonexcessive a percentage of profit to sales of 20 percent. The principal renegotiable product both years was a stamped aluminum magazine, a component of the famous M–16 rifle. In the review years this gun was proprietary with Colt Industries, Inc. and plaintiff was its sole subcontractor for the magazine. It was the first such rifle magazine made of aluminum, adding greatly to the superiority of the rifle, and was produced by plaintiff after overcoming in earlier years production difficulties that baffled other potential subcontractors. Before renegotiation, the ratio of sales to profit for the two prior years, 1964 and 1965, and the review years was:

| | 1964 | 1965 | 1966 | 1967 (short year) |
|---|---|---|---|---|
| Reneg. Sales | $1,054,016 | $1,289,703 | $3,568,609 | $3,969,552 |
| Reneg. Profits | 71,072 | 85,436 | 651,964 | 942,417 |
| Ratio profit to sales | 6.7% | 8.6% | 18.46% | 23.7% |

A break down of per unit cost of goods sold (magazine only) was included in plaintiff's exhibit 67, the report of plaintiff's expert, Mr. Ahlberg.

| | 1964 | 1965 | 1966 | 1967 |
|---|---|---|---|---|
| Units, number | 79,011 | 984,426 | 2,917,332 | 3,573,548 |
| Material | .4537 | .4184 | .4211 | .3803 |
| Labor | .1287 | .1287 | .1299 | .1105 |
| Overhead | .1955 | .1987 | .1935 | .1422 |
| Cost of Sales | .7829 | .7458 | .7445 | .6331 |

But this impressive showing of cost decrease as volume increased was not matched by unit price reductions. Prices to Colt per unit were (Finding 61):

| 1964 | 1965 | 1966 | 1967 |
|---|---|---|---|
| $1.18–1.01 | .96 | .93 | .93 |

The 1966 and 1967 prices are adjusted from 97 cents by 4 cents, the cost of an added packaging requirement. For 1965, one order only was $1.01, 96 cents being the figure for all the others.

While defendant (through Colt) got some price concessions doubtless related to volume, plaintiff, at the end of its 1967 year, August 15, when it merged with Simmonds, was pocketing the major part of the benefits in the form of a rapidly rising margin

of the unit price over the cost of sales, reaching almost 30 cents per unit. This was a situation renegotiation could not ignore. As we said in *Butkin Precision Mfg. Corp. v. United States*, 211 Ct.Cl. 110, 121, 544 F.2d 499, 505 (1976)—

> * * * That the high volume orders were more profitable to fill, than low volume orders, is precisely the situation Renegotiation was invented to deal with. Experience in several wars has shown the tendency for unit prices not, to decline as fast as the volume increase would justify. * *

It is clear that part of the cost savings were due to efficiency, not mere volume, but defendant cannot be denied all the benefits even from efficiency. And this is not all. We also pointed out in *Butkin* that the value added ratio was the key consideration in application of the *Character of Business* factor. 211 Ct.Cl. at 129, 544 F.2d at 509–10. *See also Tool Products Co. v. United States*, 218 Ct.Cl. 486, 589 F.2d 506 (1978) where we showed from a board decision the correct method of determining the value added ratio and drawing conclusions from it. *Compare Carey Industries, Inc. v. United States*, 222 Ct.Cl. ——, 614 F.2d 734 (1980) where a value added of but 2 percent was held to be "stunningly minimal" and requiring an adverse consideration under the *Character of Business* factor. A glance at the figures in this case excerpted from exhibit 67, *supra*, will show that in 1967 the material component was to the whole cost of sales as .3803 to .6331, labor and overhead, the components reflecting the addition of value being combined, but .2527. The totals in finding 64 show the same thing: in renegotiable business in 1967 out of a total cost of goods sold of $2,644,766 the material component was $1,662,815. This is a much lower value added ratio than in *Tool Products, supra*, but far better than in *Carey*. Mr. Kaitz, defendant's expert, exclaims about the low value added in his testimony, tr. 1138 and ff, and furnishes support he was well qualified to give for our conclusion that the value added was on the low side. This requires to be carefully considered before one awards the contractor a substantial bonus under the *Character of Business* factor. However, Mr. Kaitz determined that the raw material was worth only about 7 cents a unit, the remainder of the material component being added by subcontractors under plaintiff, and care must be taken not to apply the factor in a way to penalize plaintiff for subcontracting with small business.

Plaintiff argues for a clearance for 1967 on the theory that this case was tried well after *Major Coat Co. v. United States*, 211 Ct.Cl. 1, 543 F.2d 97 (1976); that the opinion in *Major Coat* laments the absence of comparisons with other contractors in the same line of work that it deems necessary to an informed and reasoned determination; decries the reliance of the government on IRS consolidated data; and forecasts that in cases to be later tried, the court would not try to squeeze a decision out of other facts of lesser probative value, but would boldly hold against the party having the burden of persuasion, the defendant. This theme is also sounded in later opinions, e. g., *Tool Products Co., supra; American Diversified Corp. v. United States*, 221 Ct.Cl. ——, 609 F.2d 442 (1979); *Blue Bell, Inc. v. United States*, 213 Ct.Cl. 442, 450, 556 F.2d 1118, 1124 (1977). *Major Coat*, however, was not written to prescribe use of one single method of proving excessive profits and bar all others. See comments on denial of motion for rehearing in *Major Coat*, starting at 211 Ct.Cl. 50, 543 F.2d 97. In *Carey Industries, Inc., supra*, also tried after *Major Coat*, we held it not possible to clear a contractor for lack of comparative data when its operation was unique. In the present case the plaintiff was the sole supplier of the aluminum magazine, a unique component, of an end product then obtained only from Colt. Contemporary suppliers of different components to different end products no doubt could have been dredged up and the already lengthy trial further prolonged by inquiries into their operations and their similarities and differences to the operation under review. The outcome hardly could have added much to what the trier of fact already knew from the experts

of both sides, *i. e.*, that subcontract component suppliers of hardware such as plaintiff normally expected to earn about 10 percent on sales. (Plaintiff denies its expert said this, but the transcript shows he did.) An effort was made to use for comparison an operation of Adventure Line Mfg. Co. that on December 31, 1969, long after the period under review, bid 65 cents a unit on 2.4 million M–16 magazines, but failed in quality miserably. See findings 71–79. Plaintiff's plant continued to produce the magazines with financial and quality success through 1970, after becoming a division of the *Simmonds* company and being under its control. The significance of this in renegotiation is not readily ascertained. The trial judge had the benefit of comparisons with plaintiff's renegotiable operations of 1965 and earlier years, as well as with its commercial operations, to some extent, though neither party showed him what those operations were.

The court's criticisms of the government's mode of sustaining its burden of proof in the cited cases tried before *Major Coat* also has focused on the inadequacy of the opinion testimony offered. It would still seem as we stated in the *Tool Products* case, that those with actual prior experience with renegotiation could give the best expert aid to the court and there must be hundreds still alive who would meet that description, seeing that renegotiation functioned almost continuously from 1942 to its recent demise. Mr. Kaitz (formerly dean of Georgetown Business School: he prefers not to be called Dr. Kaitz now) the government witness in this case, has repeatedly qualified as an expert, as he did here, but he never had touched a renegotiation case from any angle before his initiation as a witness to tell us how to do it. He has taken frequent lumps from this court, partly due to his own modesty in not claiming ability to advise the court on the techniques it must employ in the informed and reasoned weighing together of not less than *all* the statutory factors. He purports to be, and is, a qualified financial analyst. The reviewing judge who takes the trouble to read his testimony will find frequent valuable insights, but will

remain obliged to adjudicate without the help of expert testimony on many important points where expertise is needed. However, he is better aided than was this court in the very first renegotiation case it adjudicated: *Mason & Hanger-Silas Mason Co. v. United States*, 207 Ct.Cl. 106, 518 F.2d 1341 (1975) where a majority of the court felt qualified to, and did determine excessive profits with *no* help from expert testimony.

The absence of comparison evidence is adequately explained, therefore, in this case tried *post Major Coat*, but the previously noted deficiencies in the expert testimony remain uncorrected. However, the differences between one expert witness and another are matters of degree, not kind, and in view of the unrepudiated *Mason & Hanger* precedent, this court assuredly never intended to say it would grant a clearance in face of indications of excessive profits obvious even to a nonexpert, as a kind of sanction for deficiencies in the government expert testimony. Accordingly, we reject plaintiff's insistence on a clearance for its 1967 short fiscal year, and its exceptions to the trial judge's conclusion that profits received or accrued in that year over 20 percent on sales were excessive.

The defendant, in support of its exceptions, says correctly that the experts on both sides used 10 percent as the "starting point" on the statutory "normal earnings" in factor analysis. The trial judge used 12 percent because of the excess of the commercial ratio of profit to sales over the military ratio, and thus his figure, unlike that of the experts, reflects consideration of plaintiff's performance in the civilian economy. Defendant says the trial judge had already held he knew from the record little or nothing about the commercial business, so how could he assume it was sufficiently similar to justify considering it in determining "normal earnings?" The excess of the profit ratio in commercial business is a somewhat dubious fact as plaintiff did not have a cost accounting system adequate to measure the cost of the individual items in the plaintiff's product lines. The allocation

of other costs in accordance with the allocation of direct labor produced the unusual result of the commercial profit level appearing the greater. The defendant attacked this method of allocation and the trial judge sustained it. The parties did not rehash the issue before us and we take it as given that the commercial profit ratio was greater. The law sanctions the consideration of "peacetime products" in determining "reasonableness of cost and profits." 50 U.S.C. App. § 1213(e)(1); *Camel Mfg. Co. v. United States*, 215 Ct.Cl. 460, 572 F.2d 280 (1978). If in this case the "peacetime products" were so different as to deprive the comparison of significance, it was for defendant, with the burden of persuasion, to show it. This is a clear case where defendant perhaps suffers because of inadequacies of proof it could easily have corrected.

▮ On "normal earnings" of 12 percent, the trial judge's upward adjustment of 8 percent appears to us to be within the zone of reasonableness, particularly since, even in cases tried before *Major Coat*, the effect of inadequacies in defendant's proofs has been to widen that zone, the court being unwilling to resolve uncertainties against the contractor. *Tool Products, supra*. We agree that the losses suffered by Simmonds in its Universal Division after 1970 are mostly, so far as the record shows, writeoffs of the stepped up capitalization resulting from the terms of the purchase effective August 15, 1967. If Universal had continued as it was, without such a step up, we agree with Mr. Kaitz that its losses surely would have been materially less and its reconversion to "peacetime products" could have been effected without catastrophic or perhaps any loss. As it was, Simmonds rejoiced in the continuance of a high military demand through 1970. Where, as in *Tool Products*, catastrophe happened to the same company and sooner after the years under review, the risk factor played a large part in factor analysis. We pointed out that it was applied to actual results by hindsight, being conceived of in the board regulations as in part a mitigation of the rigidities of fiscal year renegotiation. Here, even with the aid of hindsight,

the risk factor cannot be made to play so large a part. It is clear, however, that the rate of return on renegotiable business was low in 1964 and 1965 and reflected learning and start-up costs in production of the M–16 magazine. A sum or sums must be taken off the profit in the first year where such profit was otherwise excessive, 1967, and in factor analysis reallocated to 1964–65. The amounts that would be necessary to raise the renegotiable profit for those years to 12 percent can readily be computed and are $124,738. However, the corresponding figure suggested by plaintiff's expert was, for both years, $97,864; for an expert hired by a party, his testimony was conservative. Neither figure is very large related to 1967 renegotiable sales.

Under the capital and net worth factor, it is notable as in *Butkin, supra*, that the contractor leased its plant from its stockholders and it is suggested again, as in *Butkin*, that to construct meaningful capital and net worth data, it would have been necessary to consolidate all the assets used in the business, which was not done. Contractor's favorable recognition for absence of government or customer furnished financing or material would offset the unfavorable effect of a high ratio of profit to net worth. Defendant cannot and does not complain because the factor was treated as neutral. The other elements in factor analysis are well set forth by the trial judge and we would not be certain that enough weight had been given them if an allowable profit of under 20 percent had been proposed. Plaintiff was outstanding in efficiency and in contribution to the war effort and low recognition of these factors would penalize it for its achievements. Therefore, we reject defendant's exceptions to the proposed decision just as we do plaintiff's.

Our conclusions summarize as follows:

| | 1966 | 1967 (to Aug. 15) |
|---|---|---|
| Renegotiable Sales | $3,568,609 | $3,969,552 |
| Renegotiable Profit | 651,864 | 940,920 |
| Percent return | 18.46% | 23.7% |
| Profit to be eliminated | Clearance | 183,762 |
| Adjusted sales | No change | 3,785,790 |
| Adjusted Profit | No change | 757,158 |
| Adjusted percent return | No change | 20% |

It would be enlightening, for comparison, to state the board's figures but, except for the refunds it ordered, they cannot be found in the record. *Cf.* the summaries in *Dynasciences Corp. v. United States*, 214 Ct.Cl. 643, 657 (1977); *Tool Products Company, supra,* 218 Ct.Cl. at 503, 589 F.2d at 514.

The trial judge's findings of fact are adopted by the court but are not printed as they have been furnished to the parties. Statements of fact in the foregoing per curiam opinion may be taken as additional findings by the court if they have no counterpart in the trial judge's findings.

The trial judge's opinion, modified to reflect his correction thereof on October 1, 1979, now follows:

## OPINION OF TRIAL JUDGE

COLAIANNI, Trial Judge: Plaintiff has come to this court seeking a *de novo* review of a unilateral determination by the Renegotiation Board that its predecessor in interest, Universal Industries, Inc. (Universal), realized excessive profits from contracts subject to the Renegotiation Act. On October 3, 1973, the Board found that Universal's profits were excessive by $250,000 in 1966 and $550,000 in the period January 1—August 15, 1967. Plaintiff, which purchased Universal on August 15, 1967, paid the full amount assessed, less credits for federal and state taxes, and brought timely suit under Section 108 of the Renegotiation Act of 1951, *as amended,* 50 U.S.C.App. § 1218 (Supp. V, 1975). Plaintiff asks the court to find that Universal realized no excessive profits within the meaning of the Act for the periods in question. The Government requests that I find that the excessive profits were even greater than the amounts found by the Board: $352,000 in 1966 and $563,000 in 1967.

Universal was founded in 1945 as a small family owned metal fabrication business. From this modest beginning, the company grew and prospered as a direct result of the efforts of its family owner-operators. It gradually acquired something of a reputation as a specialty fabrication firm, accepting difficult or unusual jobs that other companies were reluctant to bid on. By 1958 the company, though still small, was doing well.

In that year Colt Industries, Inc. (Colt), approached Universal with a subcontracting proposal. Colt had just acquired the manufacturing rights in the Fairchild AR–15 rifle. This rifle, later renamed the M–16, gained fame during the Vietnam conflict. Colt was interested in recruiting manufacturers to fabricate several of the component parts for the AR–15, the most important and difficult of these being an unprecedented aluminum magazine. Universal agreed to try.

Between 1959 and 1963, Universal designed methods for the manufacture of the magazine and of the other components. The technical problems encountered in fabricating an aluminum magazine (all previous magazines had been made of steel) were considerable, but by 1964 Universal solved most of the problems and had the theoretical know-how to begin manufacturing the aluminum magazine.

Meanwhile, the United States Armed Forces were beginning to show an interest in the new rifle. In 1963, Colt received a contract from the Air Force for the purchase of 8500 rifles. Late in 1965, the military services officially adopted the rifle as a standard weapon, renamed it the M–16, and ordered 104,000 rifles. As the exigencies of the Vietnam War increased, Government demand rose rapidly and over the next 3 years the number of components manufactured and sold by Universal to the Government soared. Several important improvements were made to the component manufacturing processes over this period. In addition, Universal expanded its manufacturing facilities during the 1963–65 period.

On August 15, 1967, in the thick of wartime demand, the family owner-operators of Universal sold their entire business to plaintiff, a conglomerate with diversified interests. The Universal Division, as it became known, continued to prosper until, in 1970, the war demand began to diminish. By

that time the Universal Division had become almost completely dependent on M-16 subcontracts, and when no new orders were forthcoming, the business was liquidated and sold at a loss.

The above is a general outline of the history of the company whose profits I am now asked to evaluate. The Renegotiation Board determined that large amounts of excessive profit were realized during the heavy demand years of 1966 and 1967. By bringing the case to this court, plaintiff has entitled itself to a complete *de novo* determination of the existence and amount of excessive profits for those years. A full trial was held to assist this court in making that determination.

█ Our case law has divided the burdens of proof for the various issues arising in suits brought under the Renegotiation Act. Since the plaintiff-contractor institutes the suit, it has the burden of pleading and proving a prima facie case. To meet this burden, the plaintiff-contractor must go forward with proof as to the statutory factors upon which it relies. In addition, there is also placed upon the plaintiff-contractor the burden of proving the accuracy of any disputed financial data. Once the plaintiff has met his burdens, the defendant is given the burden of persuasion on the ultimate issue of the existence and the extent of excessive profits. *Lykes Brothers S.S. Co., Inc. v. United States*, 198 Ct.Cl. 312, 459 F.2d 1393 (1972).

█ My analysis of the issues presented follows the same approach set forth in the recent decisions of this court in the renegotiation field, including, *Camel Mfg. Co. v. United States*, 215 Ct.Cl. 460, 469–71, 572 F.2d 280, 285 (1978). As this and other cases have pointed out, attention initially focuses on two important accounting determinations, *i. e.*, the dollar amount of plaintiff's total profits for the periods under review, and those profits expressed as a percentage of plaintiff's sales. The plaintiff normally bears the burden of proof in these areas. The next step of the analytical process calls for a determination of whether the profits established in the first step are excessive. This requires an examination of the standards of comparison to be applied to the plaintiff, and a step-by-step evaluation of plaintiff's performance of its contracts under each of the statutory factors which Congress has mandated for consideration. This blueprint for action leads to the final disposition of all the issues in the case.

## I. *Accounting Determinations*

A. *Total dollar profits.* Little dispute exists over plaintiff's financial data for the years under consideration here. The parties have agreed to almost all of the cost, expense, and sales figures. Only two issues remain for my determination.

The first concerns the proper allocation of indirect expenses between renegotiable and non-renegotiable business. The defendant argues in its brief that Universal's method of allocation, a method basing all allocations on a ratio determined by direct labor costs, while permissible in some contexts, is misleading in the case at bar because it results in a heavier allocation of costs to renegotiable business. The net result, says the defendant, is to make Universal's renegotiable business look more costly than it in fact was.

█ Clearly the best evidence to support such an allegation would be some showing that Universal's renegotiable business was more labor-intensive than its non-renegotiable commercial business. If labor costs were proportionately equal for the two sides of the company, then the cost allocation method chosen by Universal should be reasonable. If, on the other hand, labor accounted for a significantly higher percentage of renegotiable costs than of commercial costs, the allocation of non-labor costs to renegotiable business would be inflated and unreasonable. But defendant introduced no such evidence, and under these circumstances, the allocation on the basis of labor costs, which were the largest single cost item for Universal, appears reasonable.

█ The Government, instead of submitting evidence regarding the direct labor

costs of Universal's business, pointed to the relative profit rates of Universal's commercial and renegotiable business. Since, by the figures of either party, the net return on sales was higher for commercial business than for renegotiable business, the defendant assumed the costs must be misallocated. Defendant further bolstered this argument by noting that Universal's rate of return on commercial sales grew faster than on its renegotiable sales. This last assertion is not quite true. Using defendant's figures,[1] the profit rate on renegotiable business was 1.6 times bigger than the rate on commercial business in 1964, and 2.4 times bigger in 1965, but only 2.2 times bigger in 1966 and 1.2 times bigger in 1967.

However, even setting aside these discrepancies, defendant's argument is unpersuasive. The record is almost completely barren of clues to what plaintiff's commercial business consisted of. It surely would have been a simple matter for defendant to have introduced some evidence of the nature of Universal's commercial business if it wished to contest an admittedly reasonable method of cost allocations. Furthermore, both the Renegotiation Board and defendant's auditors accepted the plaintiff's allocation without demur.

■ Under the burden assignments of *Lykes Brothers, supra,* and *Camel Mfg. Co., supra,* it is the responsibility of the plaintiff to justify its allocation of expenses between commercial and renegotiable business. However, where (as here) the defendant admits that the plaintiff's allocation method is "not impermissible" and offers no alternative allocation scheme to replace it; where the defendant's auditors made no objection to the allocation basis in pretrial proceedings; and where the basis for allocation seems reasonable to the court on the record as a whole, the plaintiff has met its burden. The allocation of indirect costs based on direct labor costs appears, under the circumstances of this case, both correct and proper.

The second accounting issue is one of the chief bones of contention in this case, and is somewhat more troublesome to resolve. Universal was a small, closely held family corporation which reported its income each year until 1967 as a Subchapter S business. As far as can be ascertained from the record, all the stockholders worked for the company, and so received salaries. In addition to their regular salaries, each received a yearly bonus. The basis on which these substantial bonuses were calculated has not been shown. Plaintiff claims that the full amount of these bonuses should be allowed as a cost of doing business, *i. e.,* as officer compensation. Defendant, on the other hand, claims that the size of the bonuses paid to the officer-shareholder group precludes any thought that the bonuses were intended as compensation, and accordingly maintains that most of the bonuses should be included in Universal's profits.

The determination of reasonable compensation for officer-shareholders in a closely held business is frequently troublesome. The inquiry is almost purely factual. This court has in *A. C. Ball Co. v. United States,* 209 Ct.Cl. 223, 531 F.2d 993 (1976), a renegotiation case, previously faced this very same problem. In that case, the court concluded:

> The rule of decision for the issue of reasonable compensation is therefore the same as in tax cases under Internal Revenue Code, § 162(a)(1), namely, that "reasonable and true compensation," to be determined on all the facts, no one of which is controlling, is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances.

*Id.* at 242, 531 F.2d at 1003.

In *A. C. Ball* the Government based its computation of reasonable compensation on the income tax returns of the company under renegotiation. The court, however, gave little weight to this method, and proceeded to determine reasonable compensa-

---

1. The figures offered by the defendant were taken from plaintiff's pretrial accounting disclosure and include, as profit, compensation

disallowances recommended by the Renegotiation Board for 1966 and 1967.

tion by more directly relevant standards. But even the frail guidepost that was relied on by the Government in *A. C. Ball* is unavailable to me in this instance. Since Universal was a Subchapter S corporation until 1967, its tax returns would not make the kind of distinction which would be useful.

■ Instead, defendant apparently bases its compensation arguments on three separate grounds. First was the testimony of its financial expert, Mr. Edward M. Kaitz, who stated that he allowed "generous" or "liberal" amounts of compensation to the officers, based on his knowledge of similar businesses at the time. Second, defendant introduced hundreds of corporate-officer "help wanted" advertisements from the *Wall Street Journal*, all of which listed salaries well below the total compensation given to the officer-shareholders of Universal. Finally, defendant seems to appeal to the common sense of the court, arguing that officers of the kind involved in this case just were not being paid such high compensation in 1966 and 1967.

The first of these grounds appears weak. Mr. Kaitz admitted freely that he was not an expert in the field of executive compensation. He could not name companies, with which he was familiar at the time, whose executives could be compared with those of Universal, and, furthermore, his selection of reasonable compensation was based, not on the duties and responsibilities of each officer, but on their job titles. His bald opinion, unbuttressed by specific facts or records of actual companies, would be questionable even if he had been qualified as an expert in this field—and he had not.

■ The second ground is scarcely more helpful. The newspaper advertisements (the reproductions of which supplied to the court were, incidentally, almost illegible) are entitled to little weight. It was not shown that they were at all representative, or that no higher salary figures were offered in other advertisements. It was not shown that any of the salaries advertised were actually paid. It was not shown what fringe benefits, if any, accompanied the positions offered. Most importantly, it was not at all clear that the companies doing the advertising were similar to Universal, or that the positions required comparable performance. Most of the company descriptions in the advertisements were too sketchy to afford any real basis for comparison. The size and sales volume of the companies rarely appeared with definition, and positions offered in a newspaper advertisement might well be less demanding than jobs in a closely held family business. The advertisements should be given even less weight than the bare statistical industry averages repeatedly criticized as inadequate by this court. *See Major Coat Co. v. United States*, 211 Ct.Cl. 1, 30–34, 543 F.2d 97, 114–15 (1976); *Butkin Precision Mfg. Corp. v. United States*, 211 Ct.Cl. 110, 118–19, 544 F.2d 499, 504 (1976); *Gibraltar Mfg. Co. v. United States*, 212 Ct.Cl. 226, 229, 546 F.2d 386, 388 (1976).

We think, however, that there is merit in the defendant's third argument that officers in small businesses ordinarily do not make extravagant salaries, and that large amounts of compensation must be examined with a suspicious eye. Such a jaundiced eye can find plentiful grounds for suspicion in the following table, which sets forth the compensation to the officer-shareholder group during the middle of the 1960's:

| | | 1963 | 1964 | 1965 | 1966 | 1967 (7½ mos.) |
|---|---|---|---|---|---|---|
| E. Ardolino | Salary | $28250 | $15175 | $15600 | $90000 | $72500 (116000 annualized) |
| (president) | Bonus | ___ | 32190 | 63963 | 181999 | ___ |
| | Total | 28250 | 47365 | 79563 | 271999 | 72500 |
| A. Carbonari | Salary | 22279 | 11385 | 11475 | 52000 | 42817 (68507 annualized) |
| (vice | Bonus | ___ | 22533 | 44773 | 127399 | ___ |
| president) | Total | 22279 | 33918 | 56248 | 179399 | 42817 |

| | | 1963 | 1964 | 1965 | 1966 | 1967 (7½ mos.) |
|---|---|---|---|---|---|---|
| A. Ardolino | Salary | $17600 | $9570 | $13168 | $34812 | $20818 (33308 annualized) |
| (shipping & | Bonus | | 17168 | 34113 | 97066 | |
| receiving) | Total | 17600 | 26738 | 47281 | 131878 | 20818 |
| C. Ardolino | Salary | 17600 | 4520 | 12345 | 28898 | 32120 (51392 annualized) |
| (purchasing | Bonus | | 16095 | 31980 | 90999 | |
| agent) | Total | 17600 | 20615 | 44325 | 119897 | 32120 |
| M. Russo | Salary | | 3710 | 5761 | 14758 | 13906 (22250 annualized) |
| (timekeeper- | Bonus | | 7511 | 14925 | 42466 | |
| payroll | Total | | 11221 | 20686 | 57224 | 13906 |
| clerk) | | | | | | |
| C. Ponzo | Salary | 7000 | 7500 | 8000 | 25000 | 20555 (32888 annualized) |
| (truck | Bonus | | 11803 | 23453 | 66733 | |
| driver) | Total | 7000 | 19303 | 31453 | 91733 | 20555 |
| J. Ardolino | Salary | 1120 | 15000 | 15000 | 50000 | 33231 (53170 annualized) |
| (retired | Bonus | | | | | |
| president; | Total | 1120 | 15000 | 15000 | 50000 | 33231 |
| consultant) | | | | | | |

Plaintiff offered little justification for these extraordinary amounts of compensation. Its defense of them consisted of showing that Mr. Kaitz was unqualified, by his experience or by information at his disposal, to criticize them. But this is not enough. Plaintiff has, at this stage of the case, the burden of going forward with evidence to prove its financial data, *Lykes Brothers S.S. Co., supra; Camel Mfg. Co., supra.* Plaintiff must make a "modest showing of probable cause" to demonstrate that it has acted responsibly in invoking the processes of the court, *Instrument Systems Corp. v. United States*, 212 Ct.Cl. 99, 108, 546 F.2d 357, 362 (1976), and this small burden is not met when the plaintiff introduces, without explanation, such improbable figures as these. Universal's total sales did not exceed $5,000,000 in either of the review years, and were considerably less in the years immediately before. Plaintiff must justify, to some extent at least, paying $131,000 to a man in charge of shipping and receiving less than $5,000,000 worth of products.

Plaintiff's only justification is that the officers worked long hours and devoted themselves selflessly to the welfare of the company. This is not to be doubted—nor is it to be wondered at, since these officers, as shareholders, *were* the company. It appears inescapable that part of the money paid to these persons was a distribution of corporate profits, not a reasonable compensation for services.

This conclusion leaves the court with the problem of ascertaining what was, in fact, a reasonable compensation for these officers and shareholders.

Defendant's expert argued that $300,000 was the maximum reasonable salary that should be attributed to the officers of Universal. However, he was not an expert in executive compensation. Moreover, his opinion was based on the newspaper advertisements already found to be unreliable. The opinion of defendant's expert is therefore of little value in resolving this issue.

Plaintiff argues that Universal's officers were deserving of the entire amount of compensation received because of the long hours and hard work they put into the company. Plaintiff, in effect asks this court to rule that the year-end bonuses paid to Universal's officer-shareholders was "just compensation" and not profit. I feel, however, that the inferences to be drawn from the cumulation of evidence, combined with the caveat that the plaintiff is vested with the burden of persuasion on this issue, dictates a contrary result.

As a general matter, the court takes note of the fact that in 1966 officer compensa-

tion totaled $902,110; $295,462 was in salary, $606,648 in bonuses. In 1967 the annualized executive compensation was $357,576, a drop of over 60%. No explanation was given for the downgrading of salaries; with business booming, logic would dictate salary increases.

The discrepancy between 1966 and 1967 is due primarily to Universal's failure to pay its officers bonuses in 1967. From the evidence presented, there appears only two possible reasons for this failure. The first is Universal's election on May 24, 1967, to terminate, retroactive to January 1, 1967, its Subchapter S status. Under Subchapter S it made no tax difference whether the owners of Universal drew money out of their company as executive compensation or as dividends. However, once Subchapter S status was terminated, and Universal was taxed as a corporation, it became critical that Universal distinguish between reasonable salaries and profits. Salary distributions are deductible by the corporation, profit distributions are not. The inference can be drawn that Universal paid no bonuses in 1967 because these bonuses were, in fact, dividends, and once Universal was no longer a Subchapter S corporation, dividends could not be distributed to shareholders under the guise of salaries.

A second potential reason for Universal's failure to pay bonuses in 1967 was the August 15, 1967, sale of Universal to the plaintiff. If the bonuses truly were compensation, it would seem that the officers of Universal would have received their pro rata shares. They did not, however, and without further explanation, this may be as clear an indication as exists that the bonuses were never considered to be compensation.

I have not overlooked the possibility that the officer's pro rata shares may have been paid to them in the form of an increase in the purchase price for Universal, or somehow taken into account in the negotiations leading to the sale. However, if that were the case, plaintiff would have introduced proof of the matter. It was certainly in plaintiff's interest to do so. Such proof, if adopted by the court, would have increased Universal's 1967 expenses and thus reduced its profit.

Thus, for all of the foregoing reasons, it is concluded that the bonuses distributed to the officers of Universal in 1966 were distributions of profit, and that the base salary for each of the review years represents a reasonable compensation for the officers of Universal.

Having resolved these two accounting issues, it becomes a simple matter to calculate Universal's total dollar profit. As detailed in the findings of fact, Universal made a net profit of $1,083,612 in 1966, of which $658,692 was allocable to renegotiable business, and a net profit of $1,198,802 in the first 7½ months of 1967, of which $940,920 was allocable to renegotiable business.

B. *Profit as a percentage of sales.* The plaintiff's sales figures are uncontroverted. Universal showed the following rates of return during the review periods:

| Period | Total Sales | Total Profit | Return on Total Sales |
|---|---|---|---|
| 1966 | $4,540,453 | $1,083,612 | 23.87% |
| 1967 (7½ mos) | 4,848,548 | 1,198,802 | 24.72% |

| Period | Renogotiable Sales | Renegotiable Profit | Return on Renegotiable Sales |
|---|---|---|---|
| 1966 | $3,568,609 | $ 658,692 | 18.46% |
| 1967 (7½ mos) | 3,969,552 | 940,920 | 23.70% |

| Period | Commercial Sales | Commercial Profit | Return on Commercial Sales |
|---|---|---|---|
| 1966 | $ 971,844 | $ 424,920 | 43.53% |
| 1967 (7½ mos) | 878,996 | 257,882 | 29.34% |

## II. *Excessiveness of Profits*

A. *Appropriate standards of comparison.* Before examining the statutory factors to determine how much, if any, "extra" profit Universal might be entitled to, we must establish standards of comparison to determine what a normal profit for Universal would be. This procedure is, in effect, an effort to reconstruct a competitive environment in which Universal's prices would be determined by the demands of a normal market unaffected by Government procurement. *Mills Mfg. Corp. v. United States,*

215 Ct.Cl. 536, 544, 571 F.2d 1162, 1166 (1978). The reconstruction, if accurate, ensures that a contractor will not be required to give up profits that he could have made without the imbalances caused by Government intervention in the marketplace, and at the same time assures the Government that it has paid no more than a fair, competitive price for its product. By postulating a normal environment, it becomes possible to see how the contractor under consideration compares with other similarly situated contractors. The application of the statutory factors of comparison then determines how the contractor's rate of return should compare with those of the other contractors. *See Aero Spacelines, Inc. v. United States*, 208 Ct.Cl. 704, 730, 530 F.2d 324, 340 (1976).

■ This court has endorsed three methods for reconstructing a normal competitive environment for a contractor under renegotiation. The contractor's performance can be compared with his own performance in prior years (the so-called "base years" approach), as was done in *Gibraltar Mfg. Co., supra*, 212 Ct.Cl. at 234–35, 546 F.2d at 391. The contractor's renegotiable business can be compared with his commercial business during the review periods. *Camel Mfg. Co., supra*. Finally, the contractor can be compared with other contractors in a position similar to his. *Major Coat Co., supra*.

There are, of course, difficulties with, and objections to, each of these approaches. There will always be obstacles to the accurate reconstruction of an economic marketplace that never existed. Nevertheless, the variety of acceptable methods is in itself one safeguard against arbitrariness, and "the greater the number of *useful* comparisons we can make, the closer we can come to estimating what a normal business environment might be." *Camel Mfg. Co., supra*, 215 Ct.Cl. at 493, 572 F.2d at 298. Attention next focuses on determining the number of useful comparisons that can be made in the case at bar.

■ Looking first at the "base years" method of computation, I note that plaintiff's sales and profits during the 2 years immediately preceding the review period were as follows:

| | 1964 | 1965 |
|---|---|---|
| Renegotiable sales | $1,054,016 | $1,289,703 |
| Renegotiable profits | 71,072 | 85,436 |
| Percent of sales | 6.7% | 6.6% |
| Non-renegotiable sales | 408,056 | 897,339 |
| Non-renegotiable profits | 41,594 | 138,523 |
| Percent of sales | 10.2% | 15.4% |

The Government points to these low rates of return (lower, at least, than those achieved by Universal during the review periods) as evidence that Universal's profits were substantially inflated during the review periods. Plaintiff argues that these figures are misleading, because Universal experienced high start-up costs during 1964 and 1965—costs which were to inure to the benefit of the Government in 1966 and 1967.

The importance of non-recurring costs on the profit history of a company has been long recognized. For example, the regulations of the Renegotiation Board provide that:

> Where it can be established that deficient profits * * * resulted from nonrecurring costs on renegotiable sales in the early stages of production which relate to production in the year under review, the Board will take this into account in reviewing the contractor's renegotiable business in the year under review * * *. RBR § 1460.10(b)(5). *See Butkin Precision Mfg. Corp., supra*, 211 Ct.Cl. at 124, 544 F.2d at 507. The evidence discloses that Universal probably did experience such non-recurring costs during 1964 and 1965.

It will be remembered that during these years Universal was solving the problems presented by mass production of the aluminum magazine. Most of these problems were technical, requiring technical solutions and capital investment. Universal determined by experiment the precise magnesium content needed to prevent distortion during heat treating of the aluminum used in the magazine tube. New dies were built and changed, and had to be cleaned and sharpened frequently. New welding equip-

ment was purchased when the welding was brought in-house (it had been subcontracted during the early stages of development). A special welding tip was developed to withstand the high temperatures necessary to weld aluminum. Mandrels for holding the magazines in place were purchased. One-fifth of the magazines were destroyed in a costly testing procedure required by Colt during the developmental stages. Universal built heat treatment furnaces, and solved a plethora of problems created by the heat treatment and aging steps. A technology for hardcoating the aluminum was created by Universal. Universal and a subcontractor perfected a new design for the magazine follower spring and changed the material of the follower itself.

It is not possible to determine from the record exactly when many of these developments took place. Universal was developing the process from 1959 to 1965. About all that can be said is that Universal spent the years until 1963 researching the technical and theoretical difficulties, and the years 1964 and 1965 developing the manufacturing technique. Many of the costs claimed by plaintiff as contributing to the deficient profits in 1964 and 1965 may or may not have fallen in those years. It is probable, though, that some did.

The dollar amount of these non-recurring costs, as well as the portion of them which occurred during 1964 and 1965, cannot be established with certainty. This lack of financial definition weakens plaintiff's argument, since it was free to introduce cost figures to show by exactly how much Universal's profits fell short of being normal during those years. Plaintiff's expert analyzed the data provided to him by the company and recommended that $34,330 and $43,534 be added to plaintiff's deficient profits for the years 1964 and 1965 respectively, but I am unable to divine a reasonable ground for choosing these amounts. I am told that they represent 1% of sales for those years, but no reason is given for this allocation. All that can be said from the record is that, for the purposes of comparison, plaintiff's rate of return on renegotiable business was lower than normal in 1964 and 1965.

█ The second possible comparison that can be made is between Universal's renegotiable business and its commercial business during the review years. Universal did almost one million dollars' worth of commercial business during each of the two review periods, and its rate of return on these sales is still another yardstick that could be applied to its renegotiable profit returns. For such a comparison to be valuable, some similarity between the two aspects of the business must be shown.

There is little concrete evidence in the record to demonstrate the nature of Universal's commercial business. The company manufactured precision parts for several large and well-known corporations, but the record does not disclose what those parts were or how difficult they were to manufacture. This comparison is, accordingly, of little value.

█ Finally, it is appropriate and relevant to compare the plaintiff's performance to that of contractors whose position in the market was similar to Universal's to determine where in the industry's hierarchy of profits Universal falls. This is difficult, since no one else in the world was manufacturing aluminum magazines for the M–16 rifle. Universal was the only producer, and Colt, the owner of exclusive proprietary rights in the rifle, was the only buyer. The situation resembles that in *Aero Spacelines, supra,* where plaintiff was the only company to offer the particular service involved. The *Aero* case can, however, be distinguished from this case in that *Aero* was concerned with the services of a unique and specially built airplane, whereas in this instance the magazine may have been unique, but the processes required to produce it were not. The absence of useful comparative data (such as profit figures from other precision metal fabrication companies) is nettling. Since the Government bears the burden of proof in this area, it "necessarily fares worse than does plaintiff for lack of this information." *Aero Spacelines, supra,* 208 Ct.Cl. at 730, 530 F.2d at 341. The best

that can be said is that the parties have unwittingly disposed of part of this problem by agreement. Specifically, both plaintiff and defendant stated in the briefs that a metal fabrication contractor might ordinarily expect to enjoy about a 10% return on sales.

The parties have also suggested two other possible contractors with which Universal could be compared. One was Universal Division of Simmonds Industries, Universal's successor in interest. The other was the Adventure Line Manufacturing Company, which began manufacturing M–16 components in 1970, 3 years after the review periods ended. I find neither comparison particularly enlightening. Simonds/Universal, immediately after its acquisition of Universal, was operating under the Universal contracts, and so provides no meaningful standard of comparison. Later, when new contracts were awarded, and when Adventure Line entered the business, it was not shown that the market was similar or that the state of the manufacturing art was in the same position it had been in during the years of Universal's production.[2] This last factor is decisive, since improvements were being made to Universal's processes right up to the time of its acquisition by plaintiff. In sum, this record reveals no contractor with enough economic similarities to Universal to permit a useful comparison to be made.

I am left, then, with two sets of figures from which to draw a standard of normal competitive profitability. The first is Universal's "base year" profits on renegotiable sales, which (as I noted above) were probably on the low side for those years because of start-up, research, and tooling costs. This rate of return was about 6.7%. The second, for what it is worth, is the parties' agreement that a rate of return of 10% for a metal fabrication contractor during this period is not unreasonable. Plaintiff's rate of return on renegotiable business was 18.46% in 1966 and 23.70% in 1967.

I feel that the "base year" rate of return, suitably adjusted upwards, is the comparison most likely to be useful in this case. In passing, it is noted that Universal's rate of return on commercial business during the base years was 13.8%. The parties' suggested figure of 10% falls midway between Universal's base year renegotiable return and its base year commercial return. It is my opinion that a rate of return in the 12% range could be regarded as a normal competitive profit in this industry for the period of time covered by the review years. Universal's profits are higher than this norm.

As a final note, recent cases have suggested taking a "sideway's glance" at the Renegotiation Board's final adjustment as a way of further confirming a chosen starting point. *Bata Shoe Co. v. United States*, 219 Ct.Cl. ——, 595 F.2d 9, 13 (1979). Here, the Board would have allowed Universal a 15.2% return on sales. The 15.2% return, of course, incorporates whatever credits the Board allowed Universal under the statutory factors, and it cannot, therefore, be used directly to certify the 12% rate that has been determined to be the normal competitive profit in this instance. Nonetheless, it is helpful here, as it was to the court in *Bata Shoe*, to give added assurance that the rate established as a normal competitive profit for the industry appears to be reasonable. In *Bata Shoe* the Board's allowance of 12.7% implied to the court that the Board would consider a 10–11% rate of return to be normal. It follows, therefore, that the Board, having allowed 15.2% in this case, would consider 12% rate of return to be a reasonable "starting point." Accordingly, a "sideway's glance" has added some credibility to the starting point selected.

B. *Statutory factors.* All that now remains is to assess Universal's performance under each of the statutory factors to determine whether its profits in excess of normal profits can be defended or justified so that they are not "excessive" within the meaning of that term in the Renegotiation Act. Some of the factors are strictly comparative, while others lend themselves to a

---

**2.** As will be discussed below, I think that it was not.

more objective determination. It is, of course, necessary to examine them all to reach a just determination: "No single fact or factor is determinative. All of the facts must be taken into account, all the statutory factors considered." *Mason & Hanger-Silas Mason Co. v. United States*, 207 Ct.Cl. 106, 118, 518 F.2d 1341, 1348 (1975).

### Renegotiation Act § 103(e)(5): Nature of the Business

■ 1. *Character of the company.* John Ardolino and his family founded Universal Industries in 1945. The company began modestly, operating in a leased plant of only 1500 sq. ft. Universal incorporated in 1947 and expanded its plant to 5000 sq. ft., and more members of the family were brought into the organization at that time. By the middle of the 1950's the company was doing well, having expanded its plant to about 50,000 sq. ft.

From its inception Universal partook of all the characteristics of a small, family-owned business. The owner-operators, dedicated to the success of the company, worked long hours, and devoted more effort and energy to their jobs than ordinary employees would have. The success of the company was due largely to their industry and skill. These persons worked well together.

Universal grew into the business of fabricating fairly complex metal parts for its customers. It produced special dies for IBM, a unique camera for American Safety Razor Company, and a variety of products for Xerox, High Standard Manufacturing Company, and Mettler Brothers. Universal often accepted jobs that other companies were reluctant to take because of difficulty or risk, and gradually acquired an excellent reputation.

In 1958, and perhaps as a result of this reputation, Colt Industries approached Universal. Colt had acquired exclusive proprietary rights in the AR–15 rifle and it asked Universal to develop manufacturing techniques for several of its unusual components, perhaps the most novel of these being a magazine made entirely of aluminum.

The AR–15's chief selling point was its light weight. It was 2½ lbs. lighter than the M–14, the standard rifle for the United States Armed Forces. Thus, the AR–15's components had to be made from aluminum and other lightweight materials, materials which were more difficult to work than ordinary steel. The design of the rifle presented new technological problems for component fabrication.

Universal successfully met the challenge. Between 1959 and 1963 the company solved most of the theoretical problems presented by the aluminum magazine and the other components. These developments, outlined above in the discussion of base-year profit deficiencies, need not be repeated here. Suffice it to say that they were substantial contributions to AR–15 technology, and many of them required high skill and expertise.

Of course, the development cost money. Some of the family were opposed to the work because it was too risky, and because it placed too great a strain on the resources of the company. Financing was difficult to obtain because Colt could give Universal no assurance that there would ever be a large market for the rifle anywhere in the world. Colt itself gave no financial assistance, nor did the Government or any other outside source. The money came from the owners, and from whatever loans they were able to obtain on the strength of other credit.

In 1964 and 1965 Universal developed production technology for the AR–15 components. Renegotiable sales for these years totaled about two million dollars. Finally, late in 1965, the Army adopted the AR–15 as its official weapon, and changed its designation to the M–16. As a result, component demand soared. Because of its previous investment of time, skill, and money, Universal was prepared to meet that demand. Renegotiable sales totaled between three and four million dollars for each of the review periods. In response to the spiraling orders, Universal expanded its plant, increased its work force, and demanded even more from its officers during this period to achieve the sharp increase in production.

Much of Universal's success in component manufacture can be attributed to the hard work and skill of its family owners—that is, to the character of the business. Our cases recognize the principle that the peculiarities of a small company operation often permit success in difficult fields of production where a larger company might fail. *See, e. g., Butkin Precision Mfg. Corp., supra,* and *A.C. Ball Co., supra.* The regulations of the Renegotiation Board also provide that "characteristics inherent in the operation of a small company" may be taken into consideration in determining excessive profits. RBR § 1460.8(b). Universal deserves favorable consideration for its success in applying its more intimate style of operation to the problems presented by novel manufacturing techniques.

 2. *Complexity of manufacturing technique.* A contractor is entitled to favorable consideration under this subfactor if he performs well a complex manufacturing operation. The Government contends that the manufacture of the components of the M–16 rifle was "uncomplicated." There is no support for the Government's contention. The standard for determining complexity was set forth in *Butkin Precision Mfg. Corp., supra,* 211 Ct.Cl. at 129, 531 F.2d at 509:

> In general, the proper test is value added. How much value did plaintiff add to the raw materials and services it purchased?

And while it is true that mere difficulty *per se* does not necessarily imply complexity, difficulty of manufacture may add significantly to the cost of production and hence to the value added to the raw materials. A careful review of the record dictates the conclusion that Universal's manufacturing technique was complex.

 The manufacturing process for the aluminum magazine was the subject of extensive proof at trial. The magazine was a precision component that had to be manufactured to exacting specifications. The magazine had to be able to feed cartridges into the M–16 firing chamber at the rate of 800 rounds per minute, and even the smallest irregularity in the feed lips of the maga-

zine would cause a malfunction. Other linear dimensions were equally critical.

The most difficult part of the magazine to manufacture was the outer casing (also called the tube or box). Because light weight was always a goal, the tube was manufactured from aluminum instead of steel. Universal originally used T–O 6061 heat-treatable sheet aluminum, but found that the magazine tube distorted out of specification when this substance was heat treated. By trial and error, Universal found that aluminum with a magnesium content between 1.0% and 1.2% would hold its shape during heat treating, and found with difficulty an aluminum supplier able to deliver aluminum which consistently met this specification. Each shipment was inspected when it entered the Universal plant. The aluminum was then chemically analyzed to determine the magnesium content, and it was tested with a micrometer to insure a thickness of .04 in., ± .001.

The aluminum was then run through a series of 15 individual die-stamping operations. The dies used in these operations quickly wore to the point where they would no longer produce acceptable tubes. The dies thus required constant cleaning and sharpening. After the die-stamping operation, the tube was folded and formed.

The specifications for the magazine designated many dimensions as critical. The distance between the tube window and the magazine lips had to be held constant within .003 in. The tube rib dimensions had to be held within .002 in. The width between the tube lips, where accuracy was essential to prevent malfunction, had to be held within .001 in. However, even if each of the individual tolerances were successfully complied with, the finished magazine would often be unacceptable because of the error that resulted from the accumulated tolerances. Thus, Universal was forced to tighten its operational tolerances beyond those called for by the specifications, and, as a result, some dies and equipment had to be changed.

After the tube was formed, it was vapor cleaned in preparation for welding. Each

magazine required five spot welds, applied in an area 3/8 in. wide and 3 7/8 in. long. Originally Universal subcontracted the welding, but because the subcontracting cost was so high (25¢ per weld) the company purchased its own welding machines and brought the welding in-house. Universal worked with its welding tip supplier to develop an electrode tip that could withstand the high temperatures necessary to weld aluminum. Universal also devised a staggered welding sequence to minimize shunting and began using steel mandrels to hold the tube in place.

Colt specified, during the early years of development, that one magazine in every five should be destruct-tested for weld defects. The test required the seam of the magazine to be peeled back and the weld pried apart. A magazine so tested was destroyed and had to be sold as scrap; it was useless for any other purpose. By 1964, only about 1% of the welds so tested proved to be defective.

Heat treating the aluminum tube created several problems. The treatment was necessary to bring the metal to a proper state of hardness. After an unsuccessful search for a subcontractor that could perform the treatment effectively, Universal built its own heat treating furnaces. The heat treating had to be controlled within 25°. While temperatures too hot caused melting and distortion, temperatures too low failed to achieve the desired hardness. The furnaces were constantly monitored to guard against these dangers.

Universal also developed special stainless steel mandrel racks that could, without themselves becoming distorted, brace the tube during heating. After some experimenting, Universal decided to form the tube slightly out of specification so that during the heat-treating process it would expand into specification. After treatment, the tube was artificially "aged" in an atmosphere created by Universal.

The next step in the manufacturing process, hardcoating, was subcontracted out. However, Universal worked with the subcontractor to develop an effective hardcoating technique.

Universal also manufactured the base plate and the retainer spring of the magazine; the follower and the follower spring were subcontracted. Universal worked with both subcontractors to improve these components, supplying tooling and drawings.

Universal's quality control system for the entire magazine manufacturing operation was extensive. Over 100 individual inspections occurred at various stages of the procedure. Every magazine produced was inspected, although not all received a complete inspection.

There can be little doubt of the complexity of the manufacturing process just described. Colt's specifications were exacting, the tolerances tight. The material was difficult to work with, but after both heat treatment and hardcoating, it emerged from the process significantly improved. Sheets of raw aluminum, fresh from the mill, were transformed into stamped and folded tubes which were within .001 in. of each other. The quality control necessary to insure regularity was extensive and demanding. The only possible conclusion is that Universal added substantially to the value of the raw materials.[3] Universal's manufacturing technique was complex, and the company is entitled to favorable consideration under this subfactor. *Cf. Gibraltar Mfg. Co., supra,* 212 Ct.Cl. at 238, 546 F.2d at 393.

3. *Character and extent of subcontracting.* Universal subcontracted the magazine's follower and follower spring, and the electrocoating and lubrication of the tube. Certain drilling work on the follower was also subcontracted under a piecework system to handicapped workers in the area of the West Haven plant. Universal made it a practice of working closely with its subcon-

---

3. This is also evident from the fact that at the time the tubes were destruct-tested, which was prior to heat treatment, Universal had 50¢ in-

vested in the part. The scrap value of the aluminum was, however, only worth about 1¢ a tube.

tractors, providing technical assistance, and, of course, assuming full responsibility for the timeliness and quality of their work.

■ Contractors are given favorable recognition for their subcontracting efforts when it appears that they have brought into the production process small businesses or other sources of production that might otherwise have been overlooked in the Government procurement process. Such activity is encouraged because it benefits the Government by establishing the broadest possible economic base for the war effort, and by encouraging efficient and fecund production by mobilizing all sections of the industry. *See* RBR § 1460.14(b)(3)(ii).

■ The record here does not support the conclusion that Universal's subcontractors were unusual, out-of-the-ordinary, or otherwise unlikely to be included in the Government's procurement effort. The single exception to this finding is the subcontracting of the follower drilling to handicapped workers. Apparently, though, the quantity of work performed by these persons was not large. At least, there is no record evidence which suggests its extent. Accordingly, Universal is entitled to some credit under this subfactor, but the amount of credit is open to doubt, and it is unlikely that it would prove to be significant.

4. *Source and nature of materials.* As described above, Universal kept careful control over all the raw aluminum entering its plant. It was only after great difficulty that Universal was able to locate a good supplier of aluminum having the desired magnesium content. Universal never acquired any of the raw materials it used from Colt, the prime contractor, or from the United States. Nor was any Government-furnished property (GFP) used. At one point during the program, Colt suggested that Universal try using a cheaper foreign aluminum, but the project (which Universal largely financed) proved unsuccessful.

■ Universal is thus entitled to some credit for the *nature* of its materials, since the aluminum was unusual and apparently difficult to produce to specifications. On the other hand, the supplier eventually found, Olin Metals Company, was a large and well-established metals firm, which apparently had no difficulty providing all the aluminum Universal required. The company experienced no real difficulty in acquiring the materials once the supplier was found, and did not bring into the Government manufacturing process any new ·or unknown contractors.

■ Plaintiff does deserve some further credit under this subfactor for purchasing all of its own materials without Government assistance. "[A] contractor which uses materials it owns itself is entitled to compensation for its investment and for its assumption of the risks of ownership." *Aero Spacelines, supra,* 208 Ct.Cl. at 734, 530 F.2d at 343. The Renegotiation Board Regulations agree. *See* RBR § 1460.-14(b)(2). Universal should be granted favorable consideration under this subfactor.

*Renegotiation Act § 103: Efficiency*

■ The contractor's efficiency is the only statutory factor to which courts are directed to give "favorable consideration." There is good reason for this. In a normal competitive marketplace, similar to the one I am trying to reconstruct, efficiency is the single most important factor in producing a high return on sales. Efficient contractors make more money than inefficient contractors. The Act seeks to recognize this economic fact of life by according a contractor favorable consideration for his efficiency; more specifically, for a degree of efficiency which can be shown to be higher than those of comparable companies.

■ Renegotiation Board Regulations define efficiency as an aggregate of many variables, including quantity of production relative to plant size, timeliness of deliveries, expansion and maximum use of producing facilities, maintenance of high quality, reductions in cost, decreases in controllable expenses, and reduction in waste. RBR § 1460.9(b). If improvements in these variables are attributable solely to an increase in Government procurement, then the cost

savings should ordinarily be passed on to the Government. However, if improvement results from the initiative and energy of the contractor, he should be allowed to keep the higher profits resulting therefrom as an incentive to maintaining efficiency.

The difficulty of establishing a normal competitive environment for this unusual and complex product, as discussed above, limits the number of useful comparisons that can be made of Universal's efficiency. Since I have no information about Universal's efficiency in its commercial operations (such information would be of small use in any case), and since no similar contractors have been presented, I am forced to confine the comparison of Universal's efficiency in the base years with its efficiency in the review period. Such an analysis must, of course, be tempered by a more general feel for what usually constitutes efficiency in production. The statute itself mentions four classes of efficiency variables, and each of the four will in turn now be examined.

1. *Reduction of costs.* Universal achieved substantial reduction in costs during the review period by making numerous improvements in its manufacturing processes, particularly those for its major product, the aluminum magazine. The two improvements in what particularly seemed to have increased its production dramatically were the introduction of a progressive die and a new method of testing welds.

Between 1964 and 1966 Universal designed and tested a progressive die which would consolidate a number of the tube-forming operations. As finally put into effect, the die combined eight individual operations into a single, unitary process. Originally, the die was fed by hand, and about 20 magazine tubes a minute could be produced. Later, an automatic feed was added, and between 60 and 70 tubes a minute were possible. Fewer employees were required to operate the progressive die than had been required to operate the eight individual steps it replaced. It is not clear from the record exactly when the die went into operation. It is fair to assume that, in accordance with the general sequence of events for production improvements, the progressive die did not replace the individual operations all at once, but underwent lengthy experimental use and adjustment. It is clear that sometime in 1966 the progressive die became fully operational.

The other big improvement to the production process was the introduction of a compression weld tester. Previous to this improvement, the Colt specifications required the destruct-testing of 20% of all the magazines produced, a very costly and wasteful procedure. In 1966 Universal replaced the destruct test with a compression test, in which a specially designed machine subjected each weld to 100 lbs. of lateral pressure. As a result, all magazines produced by Universal could be tested without waste and only those tubes which would in any case have been rejected, *i. e.*, the faulty ones, would then be destroyed.

Although to a lesser extent, other production improvements during the review years also increased efficiency by reducing costs. In 1966 Universal adapted a milk refrigeration unit for use with its welding machines. By improving the cooling of the welding tip, the unit reduced spitting, eliminated a cleaning step, and speeded up the tip cooling time. Also in 1966, Universal installed stainless steel mandrel racks to reduce wear of the mandrels used in the heat-treating process. Universal and its lubricating subcontractor jointly developed a special lubricating material which decreased the number of magazines rejected for poor lubrication. Air gauges, to measure several magazine dimensions simultaneously and thus speeded up the inspection process, were added to the production line in 1966 and 1967. A Barcol tester was installed to test the hardness of each magazine. Special aging tunnels were built to reduce the time each magazine had to be aged. Other processes for manufacturing various components were also improved, specifically, Colt and Universal jointly re-engineered the gas tube assembly while Universal, on its own, eliminated the brazing step previously required on the ejector slot cover.

It cannot be doubted on this record that these improvements contributed substantially to a reduction in product costs. What is more difficult to assess is the dollar amounts by which each improvement, or even all the improvements taken together, reduced the costs. Plaintiff's expert introduced figures which purported to show that production costs per magazine, broken down into labor costs, material costs, and indirect costs, all decreased during the review years. These figures, if accurate and provable, would provide the exact dollar figures which could be credited to the plaintiff's reduction in production costs.

Regrettably, such specificity cannot be achieved. The expert's per-magazine cost figures were based on the costs incurred for "all magazine sales." Moreover, as far as can be determined from the record, this figure could have been either the total number of magazines produced or the total number of magazines sold to Colt to fulfill military contracts—that is, total number of renegotiable magazines. As the plaintiff's expert himself testified, the difference in figures could introduce significant distortion. Furthermore, the expert's calculations did not take into account the compensation disallowances which I have deemed necessary. Finally, the expert admitted that a portion of the cut in labor costs was the result of increased worker experience and familiarity with production methods. However, since worker inexperience was one of the "start-up costs" contributing to Universal's low profits in the base years, credit for increase in efficiency has already been given to Universal. To do so again would allow double credit for the same improvement. In short, plaintiff's attempt to present me with specific figures is appreciated, and although I think that these figures do tend to establish an increase in efficiency attributable to the production line improvements, I cannot accept them as an accurate measure of the Government savings derived from plaintiff's efficiency.

■ Defendant argues that the so-called production improvements were really just economies of scale. The progressive die, the defendant, for example, argues, was not economically justified until the volume of Government orders increased. The investment in other production line improvements was similarly a direct result of the increase in demand. Consequently, says the defendant, the cost savings attributable to these efficiencies, whatever their magnitude, should be passed on to the Government.

I think this argument takes too simplistic a view. If Universal had had no orders at all for the magazine, it doubtless would not have invested money in production line equipment. It follows that *some* of the savings generated by that equipment was attributable to Government demand. It is quite a jump from there to say that *all* of the savings were so attributable. The Government's argument fails to put these improvements in their historical context. Universal had been experimenting and researching with production techniques since 1959, and had been developing a production line since 1964. These events predated the large orders by defendant which resulted from stepped-up activity in Vietnam. These improvements, many of which were a result of work done earlier than the review years, were part of a continuing effort by Universal to improve its processes and reduce costs. The Government's argument sweeps too broadly because, if literally construed, it would in effect disallow any improvement in efficiency introduced by improved manufacturing techniques.

■ The kinds of cost savings that must be passed on to the Government under the theory of economies of scale are savings which are directly related to increased volume. Such things as high-volume materials discounts and fixed-cost economies come readily to mind. Here, Universal could have retained its original production process, and met the Government's increased demand by expanding its plant and its labor force as much as was necessary to produce the required number of components. It did indeed add a second shift, but additionally it chose to improve and streamline its production technique, and should receive credit under the reduction of costs subfactor for

doing so. While the amount of credit to be given is in question, the entitlement to it is not.

■ The credit to be given under this subfactor is modified by one further observation. Universal reduced its price during the review years from $.96 to $.93 [4] per magazine. Even conceding that Universal's business was labor-intensive, the fact that the tripling of production should result in so small a decrease in distributed fixed prices is puzzling. I cannot tell for certain from the record, but it is at least possible that Universal failed to translate all of its economies of scale resulting from increased volume and decreased fixed costs per unit into lower prices to the Government. This possibility reduces somewhat the amount of credit due under this subfactor.

■ 2. *Quantity of production.* The same arguments which support giving credit to Universal for reducing costs apply to giving it credit for attaining a quantity of production sufficient to meet Government demand. Universal increased monthly production sevenfold with less than a threefold increase of plant size between 1964 and 1967. Part of this improvement was the result of the addition of a second shift. Nevertheless, the credit to be given under this subfactor hinges only on the attainment of the increased production capacity. Contractors willing to expand their businesses to meet Government demand are to receive credit for their enterprise. Universal merits such credit.

3. *Quality of production.* It is heartening to record that there is one fact in this case which has never been the subject of dispute. Everyone agrees that Universal manufactured an excellent product. Colt said so. The Army said so. Defendant's counsel in this case even said so. The rejection rate for Universal magazines was extremely low. Colt regarded Universal as one of its two or three best subcontractors. Brig. Gen. Wing, who testified for the Government, praised the excellence of the

Universal magazine. No field complaints were ever received about the performance of the magazine.

Of course, even such unanimous agreement has its limits. The defendant argues that the manufacturing process was highly repetitive, and that high quality was therefore easily attainable. Defendant also contends that Universal poured all of its skill and energy into a very few products, and that the high quality was not attained through efficiencies in manufacturing, but rather through an elaborate and labor-intensive inspection system which prevented most non-conforming units from leaving the plant. As a result of all this, says the defendant, Universal is entitled to only minimal credit under this subfactor.

■ Taking the last argument first, I cannot see any merit in the contention that credit under this subfactor should only be given for quality production the first time through. Such an approach loses sight of the fact that the ultimate goal is the final delivery of a quality product to the Government. There is no way conceptually to separate inspection from the rest of the manufacturing process. Indeed measurement, testing, and readjustment are as much a part of a manufacturing process as the initial production steps, especially in a high-precision field. If the inspections generate a large amount of waste, that is a fact which must be addressed under the "reduction in waste" subfactor, not here.

■ I also reject the Government's argument that Universal's concentration on a few specialized products should somehow be counted against it in these proceedings. If a contractor chooses to achieve high quality by intensifying its production efforts on a few Government products, the Government should be grateful for the effort. The fact that Universal had to drop its production of other products and concentrate on the magazine suggests that quality production of the magazine was difficult to achieve. Ac-

---

4. For the purposes of this comparison, the $.04 per unit cost of packaging in 7-packs during the review period has not been included.

cordingly, Universal's concentration on a few specialized products should be counted in its favor and due credit given.

■ The Government's other argument, that Universal's highly repetitive manufacturing process was conducive to high quality without exceptional effort, requires more extended discussion, since it addresses itself to the efficiency considerations that must be assessed under this subfactor. Comparative data is scant, but plaintiff answers this contention by pointing to the efforts of Adventure Line, Inc., a Kansas corporation which began in 1970 to manufacture the M–16 magazine.

In that year, after the Government had acquired the proprietary rights to the M–16 and its components, Adventure Line received a contract for 2.4 million magazines, to be shipped to Colt as GFP. Using a data package provided by the United States Army Weapons Command and presumably based heavily upon Universal's manufacturing experience, Adventure Line instituted a production line that resembled Universal's in most respects. Colt tested the Adventure Line magazines it received and found several problems with them, problems which continued almost until the end of the Adventure Line manufacturing history. Several entire shipments of the magazines had to be reworked to correct dimensional aberrations, poor lubrication, and improper heat treatment. As a result of the problems encountered by Adventure Line, Colt refused further magazines and shifted to Okay Industries, Inc., as their supplier for the components. Okay Industries is owned and operated by Mr. Edward Okay, who had served as the production manager for Universal during the review periods.

In addition to the above evidence that high quality was difficult to establish and maintain, indirect support for the proposition also exists. The latter support is based in part on a feasibility study prepared by Colt at some point in the procurement history (the study concluded that it would be too difficult to produce the magazine in-house). Another source of indirect evidence is the failure of some other companies to manufacture an acceptable magazine (although I do not know how hard they tried). I think that this evidence, coupled with the detailed description of the manufacturing and inspection technique presented at trial, is enough to establish that Universal is entitled to substantial credit for quality of production. Universal was producing a complex item which some other contractors were unable to make, and the Government was receiving a top-quality product consistently throughout a long period of production. This is the kind of quality production that was intended to be rewarded under the statute. See Gibraltar Mfg. Co., supra, 212 Ct.Cl. at 238, 546 F.2d at 393.

■ 4. *Economy in the use of materials, facilities, and manpower.* I am required by statute, finally, to consider what most people think of as efficiency, *i. e.*, whether a contractor makes the most economical use of his production resources. Universal not only tripled its plant size between 1964 and 1967, but it also increased its production per square foot of plant space as well. This was accomplished partly by hiring more workers and instituting a second shift, and partly by increasing the automation of the production line. The elimination of destruct-testing also increased significantly—in fact, by exactly 25%—its efficiency in the use of raw materials.

Universal is entitled to no credit under this subfactor for increasing its plant size and labor force, but to the extent that the improvements in production techniques permitted those workers and that plant to produce more units in the same amount of time, some favorable credit should be granted. See Aero Spacelines, supra, 208 Ct.Cl. at 733–34, 530 F.2d at 342.

Under each of the four subfactors of efficiency, then, Universal has proved entitlement to some credit, although (as is perhaps unavoidable when efficiency is being discussed) the precise amount of credit is open to question. I have noted where the increases in efficiency, in the form of reduced costs and increased quantity of production, were due solely to the increase in demand

caused by the Government procurement, but even after the elimination of such effects, Universal is left with a substantial residue of credit for efficiency. The improvements to the production line account for most of this residue. The company is also entitled to credit for producing a high quality product and consistently meeting its delivery deadlines throughout the review periods.

### Renegotiation Act § 103(e)(3): Extent of Risk Assumed

██ Risk is a normal part of any business. When the Renegotiation Act demands that credit be given for risk assumed, it speaks largely to assumptions of risk by the contractor that benefit the Government in some way. A contractor who ferrets out small subcontractors which the Government might not have found, for example, benefits the procurement program, and is entitled to credit for the increased risk it assumes that the subcontractors might default. Or, if a contractor enters into firm, fixed-price contracts with the Government, it assumes for itself a risk which might otherwise fall on the Government's shoulders:

> [W]here, as in this case, all of the business of a contractor is done under firm, fixed-price, competitively bid contracts he has obviously gone a good distance toward a showing of the assumption of substantial pricing risks of the sort for which favorable consideration should be given.

*A.C. Ball Co., supra*, 209 Ct.Cl. at 249, 531 F.2d at 1007. Contractors who sacrifice commercial business in order to work for the Government should receive credit for the risks they run should the Government procurement dwindle.

██ Universal deserves only minimal credit under this factor for operating under firm, fixed-price contracts. Normally, such contracts place most of the risk of changing markets and business conditions on the contractor, since they leave him with little flexibility to cope with sudden increases in costs. However, there are mitigating fac-

tors in this case which reduce the normal risks involved in firm, fixed-price contracts. Plaintiff's contracts with Colt were frequent and relatively small in quantity. There were three separate orders in 1966 and 12 separate orders in 1967. Thus, Universal was in a position to adjust it's bid in reaction to changing market conditions fairly often. This naturally reduced the inherent risks of firm, fixed-price contracts. *Bata Shoe Co., supra.* Additionally, I must point out that there was no evidence that either material or labor costs were subject to wide fluctuations. Nor was there evidence of any inability to accurately forecast material and labor costs. *See Graniteville Co. v. United States*, 220 Ct.Cl. ——, ——, 602 F.2d 282, 293 (1979). Plaintiff is entitled to only minimal consideration with respect to the assumption of risks for operating under firm, fixed-price contracts.

The Government's argument that Universal's contracts were only purchase orders, which could be freely refused if Universal did not want the business, overlooks the realities of commercial operations. Colt's solicitations for magazines could be regarded as non-binding "purchase orders," but there is no question in this case that the magazines actually delivered were produced pursuant to binding obligations incurred for a fixed price.

██ The Government also argues that the contracts were not competitively bid. To the contrary, the record shows that, during the review years, Colt was actively seeking other sources of supply for M–16 components. Thus, the contracts entered into by Universal partake of at least some of the characteristics of competitively bid contracts. Nevertheless, the inability of others to effectively manufacture the magazine must have significantly reduced competition. This tempers the weight to be given to the credit under this subfactor, but does not eliminate the credit itself.

██ Plaintiff also seeks credit for risk generated because, he claims, the Army would not commit itself to the 20-round magazine that Universal had developed, but

was constantly searching for new and better components, including a 30-round aluminum magazine and a disposable plastic magazine. I cannot agree. This argument might have some merit if the Army had been clearly dissatisfied with the 20-round aluminum magazine and was ordering it purely as a stopgap measure until something better came along. However, the record in this case shows that the contrary was true. Certainly the Army was always trying to improve its rifle, but any possible improvement was far in the future in 1966 and 1967. The Government purchased well over 6,000,000 magazines during the review periods. Plaintiff may feel that this does not represent a significant "commitment" to its product. However, the Government is not required to formally renounce all competing products. Universal deserves no credit for this risk since it is no more than the risk which every business competing in the marketplace should expect.

■ Plaintiff seeks credit for its reliance on subcontractors during the review periods. This court has observed that a contractor who commits himself to a delivery schedule thereby assumes the risk that his subcontractors may default or delay. *A.C. Ball Co., supra*, 209 Ct.Cl. at 254, 531 F.2d at 1010. Universal is therefore entitled to some amount of credit under this subfactor. That amount, though, is probably small for two reasons. First of all, Universal subcontracted only a small part of its manufacturing process. Most of the operations, including some that had originally been subcontracted, were performed in-house. Obviously, as the number of subcontractors decreases, so does the risk. Second, the record shows that Universal worked in close collaboration with its subcontractors. Universal gave technical assistance, provided tooling, cooperated in the development of new products, and generally kept close tabs on the progress and performance of subcontracted work. Since the risk of subcontracting comes from letting the product pass out of the contractor's control, an increase in control over the subcontracting operations decreases the risk. Universal had considerable control over its subcontractors, so its risk again was minimal.

Plaintiff argues strenuously that Universal is entitled to substantial credit for its sacrifice of profitable commercial business during the review years. Because the amount of credit plaintiff claims, if proved, would wipe out even the largest sum of excessive profits asserted by the Government, this argument merits close consideration.

Plaintiff offers two factual assertions to support its argument for substantial credit for loss of commercial business. The first is the testimony of Mr. Edward Ardolino, the president of Universal during the review periods, that the company turned down about $2,000,000 worth of commercial business during the review years. Defendant disagrees, pointing to the complete lack of documentary evidence or other support for Mr. Ardolino's self-serving statements. I agree with the Government since I feel that Mr. Ardolino's testimony does not establish with any degree of certainty the *amount* of business sacrificed by Universal during the review periods. While, as plaintiff argues, this testimony does prove that some commercial business was turned down, the record clearly shows that the witness was merely giving an estimate, and not an accurate calculation of how much business was actually rejected. Indeed, it appears from the testimony that such a calculation would be difficult, if not impossible, to make.

■ Of course, the sacrifice of commercial business for Government business does not automatically entitle a contractor to credit under this subfactor. It must be shown that the sacrifice of commercial business put the contractor at some additional risk, since otherwise he experienced only the same risks he would have assumed in dealing with commercial customers. Plaintiff attempts to establish entitlement to credit by tracing the history of the Universal Division of Simmonds Corporation (Universal's successor in interest) through its dissolution in 1971. Plaintiff catalogues in great detail the sudden drop in Government

procurement, followed by the closing of Universal amid monthly operating losses. It is claimed that the loss sustained by Simmonds/Universal in 1971 should be offset against any profits made by Universal during the review years. We are referred to the cases of *Butkin Precision Mfg. Corp., supra; Major Coat Co., supra;* and *Camel Mfg. Co., supra.* Such a dollar-for-dollar offset was actually used in *Butkin,* where the court allowed a contractor full credit for a subsequent year's loss, including an allowance for a reasonable profit. The precise method was not used in *Major Coat,* where the court merely included the fact of loss as proof of some risk incident to the sacrifice of the commercial market and awarded credit accordingly. And in *Camel,* this court decided that credit should be accorded this risk when comparing the contractor to its own commercial business, but not when comparing it to other contractors (who presumably would have had to undertake the same risk). Again, no dollar credit was given.

The upshot of these decisions is that I cannot accept plaintiff's claim for dollar-for-dollar credit for the risk attendant to the sacrifice of commercial business. The observation that this case is one step removed from the cases cited above is further support for the above conclusion. Indeed, the businesses in the above-cited cases continued to operate without dissolution or alteration of the corporate structure, while in this case the losses were generated by the liquidation of the entire company. Liquidation often generates losses other than those attributable solely to the loss of profitability. The losses in the case at bar occurred a full 4 years subsequent to the review period. It is uncertain what part, if any, of the 1971 loss was due to events occurring, or actions taken, in the post-review period years. By way of example, I do know that, after the acquisition, Simmonds increased Universal's fixed assets nearly two million dollars. What I do not know is how this increase in assets affected Simmonds' 1971 loss. Furthermore, the company liquidated was a successor in interest to the company under consideration—a small point, possibly, but one which renders even more uncertain any precise dollar loss allocation. The purchase price paid for Universal in 1967, which was some $7,000,000 more than the value of its fixed assets, presumably included a capitalization of future earnings of the company. Such a capitalization may have been overly optimistic, forcing Simmonds to write off some of the projected profits on liquidation and increasing the apparent loss. My task is to find how much risk Universal really underwent, not how much risk Simmonds thought existed.

Nevertheless, evidence of the 1971 losses of Universal Division and of its ensuing liquidation at a loss should be given special consideration. The Renegotiation Board Regulations state in pertinent part:

> The Board will give special consideration to evidence showing risks through actual realization of losses incurred by the contractor in performing contracts in other years similar to the contracts undergoing renegotiation, and losses incurred in the same or other years by concerns other than the contractor, especially when connected with the contractor in any way, and in performing similar contracts.

RBR § 1460.12(b)(1); *Butkin Precision Mfg. Corp., supra,* 211 Ct.Cl. at 127, 544 F.2d at 508. Thus, while little credence can be given to the actual dollar loss claimed on the liquidation of Universal Division, special consideration should be given to the fact of such a loss. This court has recently pointed out that cogent evidence of the riskiness of an undertaking can be found in the ultimate realization, by way of financial disaster, of that risk. *Tool Products Co. v. United States,* 218 Ct.Cl. 486, 495–96, 589 F.2d 506, 510 (1978).

Whether the Universal decision to devote such a substantial portion of its business to defense work was motivated by an attempt to maximize profits is unimportant. The risk factor was not designed to reward only the patriotic. It is merely a recognition of the obvious; the riskier one's investment is, the greater the return on one's investment should be. *Butkin Precision*

*Mfg. Corp., supra*, 211 Ct.Cl. at 126, 544 F.2d at 508. In what seems curiously apropos to the case before us, the court in *Tool Products Co.* stated at 589 F.2d 512:

> The board regulation clearly sanctions recourse to hindsight in assessing the risk of financial disaster when a small company abandons the prudent policy of obtaining a wide range of customers for a variety of commercial products and delivers 80 percent of its production to one customer, the government, that may and in fact did cease its demand with relative suddenness.

In short, I recognize and reaffirm the principle that "the risk factor is often the sole protection of the small business concern against a tunnel-visioned application of the fiscal year method of renegotiation to its profitable years only," *Butkin Precision Mfg. Corp., supra*, 211 Ct.Cl. at 127, 544 F.2d at 508–509, and I feel that the contractor is entitled to substantial credit under this factor. However, I think that it is not necessary to go further and give full dollar credit for the losses sustained on the collapse and liquidation of a successor corporation 4 years after the review periods.

I conclude that Universal is entitled to some, though not complete, credit under the risk factor. It is entitled to substantial credit for its sacrifice of commercial business, but only minimal credit for the assumption of risks associated with fixed-price contracts. It is entitled to little additional credit for its reliance on subcontractors or its dependence on a product not "fully adopted" for use by the military. Nor is it entitled to full dollar credit for the loss sustained by Universal/Simmonds in 1971.

### Renegotiation Act § 103(e)(4): Contribution to the Defense Effort

Section 103(e)(4) of the Renegotiation Act requires consideration of the—

> Nature and extent of contribution to the defense effort, including inventive and developmental contributions and cooperation with the Government and other contractors in supplying technical assistance.

This court has construed this section to mean that—

> [T]he contractor who performs a defense contract does not by that token make a contribution within the meaning of the Renegotiation Act. Favorable consideration is rather due a contractor for "superior performance" or "performance, assistance or service considered otherwise exceptional"; illustrations are "completion of urgent work ahead of schedule or exceeding specifications" with benefit to the defense effort, "ingenuity in providing new uses" for products or equipment, "overcoming difficulties, which others have failed to overcome," or "experimental and developmental work of value to the defense effort, new inventions, techniques, and processes of unusual merit," work under difficult or hazardous conditions, cooperation with the Government and with other contractors.

*Mason & Hanger-Silas Mason Co., supra*, 207 Ct.Cl. at 128–29, 518 F.2d at 1354–55.

There is no dispute that the M–16 and its component parts were vital to the United States defense effort in Vietnam. Brig. Gen. Wing testified to the importance of the weapon in military activities there. As the standard infantry rifle, its worth can hardly be overestimated. Its light weight, increased fire power and accuracy, and peculiar suitability to corrosive climates made it vastly preferable to its predecessor, the M–14.

This, however, is only the first step in an analysis of the credit due under this factor. It is also necessary to determine whether and to what extent Universal contributed to the success of this weapons program, and whether Universal demonstrated extraordinary effort or other unusual circumstances. I conclude that Universal is entitled to moderate credit under this factor.

Most of the credit due Universal stems from its experimental and developmental work with the magazine. Beginning in 1959 and stretching all the way through the review periods, Universal was engaged in a continuous process of testing,

improving, and refining its manufacturing techniques. It took an untried product design and developed a practical mass-production technique. I have described above the technical and practical problems that Universal overcame in order to do this. The excellence of Universal's contribution is further enhanced by the reluctance or failure of other companies, some of them large and well-equipped, to develop and produce a similar manufacturing technique with a high quality end product.

■ Defendant argues against credit for this contribution for two reasons. First, says the Government, much of this developmental work was undertaken before the United States had officially adopted the M–16 as a standard weapon. Consequently, the development that was undertaken before that adoption was commercial work done for a commercial customer and is not entitled to credit here. No authority has been cited to support this argument. The Act does not require that developmental or experimental work be undertaken pursuant to a binding contract with the Government, or while such contracts are in force. It requires only that in its research and development the contractor has taken steps which benefited the defense effort. To impose an arbitrary cutoff point beyond which no credit could be granted, however beneficial and valuable a contractor's experimenting might have been, is, I feel, contrary to the spirit of the Act. Furthermore, the record shows that the Government began to try to acquire the proprietary rights to the M–16 as early as 1963. Thus, even if I were disposed to deny credit for development from 1959 through 1962, substantial credit would still be due Universal for its work between 1963 and 1967.

■ The Government's second argument is that the development undertaken and accomplished by Universal was not development at all, and that the difficulties overcome by Universal were all of its own making. In support of this latter contention, defendant argues that other producers of the magazine encountered no similar problems when they went into production later on. The Government relies mainly on the experience of the Adventure Line company, discussed above, which did not encounter some of the problems faced and solved by Universal. The parties devoted a great deal of effort to proving whether or not Adventure Line did face the same production difficulties, and whether or not its techniques produced a quality product. This discussion appears irrelevant to this factor. Even assuming that Adventure Line was able in 1971 to set up an error-free production line with little or no technological difficulties (which seems a doubtful assertion from this record), I find that fact of little probative force. First of all, Adventure Line went into production with assistance from the United States military services, who had acquired considerable technological information from Universal itself. Thus, it would be surprising if Adventure Line encountered the same problems as Universal. Secondly, Adventure Line, unlike Universal, was the beneficiary of financial assistance from federal and state authorities. Thirdly, Adventure Line began to set up its production process in 1970, fully 11 years after Universal began its developmental effort. The state of the aluminum fabrication art surely advanced during those 11 years, especially since Colt during this time asked several large contractors to try to produce the aluminum magazine. In short, Adventure Line's freedom from Universal's problems, even if this were conclusively shown to be the case, would prove little. I find much more probative on this point the failure of the other contractors to overcome the production difficulties *at the same time Universal was solving the problems.* The Government suggests that other companies were reluctant to invest much time or money in the problems of magazine manufacture because Universal had such a "head start." But the record clearly shows that several companies did in fact try to do just that. Universal is entitled to considerable credit under the subfactors of experimental work and overcoming difficulties.

Plaintiff also argues that Universal is entitled to credit for its superior performance and for its cooperation with other contractors. While the quality of the magazine was, as discussed above, excellent, I do not feel that this is quite what "superior performance" means under this subfactor. Contractors are already rewarded for quality production under the efficiency factor. Superior performance is rather to be defined as the court defined it in *Mason & Hanger-Silas Mason Co., supra:* making deliveries ahead of schedule, exceeding specifications, or otherwise going beyond what is expected of a contractor. Credit is not due simply because a contractor has performed his contract. "Extraordinary performance" means performance that exceeds the terms of the contract. Universal made a splendid product, but it was required by its contract to do so. Universal deserves no further credit under this subfactor.

As for its cooperation with other contractors, plaintiff claims that Universal's cooperation with Colt, the prime contractor, merits favorable consideration. Surely a subcontractor will always cooperate with his prime contractor; the subfactor of cooperation must mean more than this. It means, in fact, the kind of cooperation undertaken by the contractor in cases like *Camel Mfg. Co., supra,* 215 Ct.Cl. at 507, 572 F.2d at 306. There, the contractor lent technical assistance to potential competitors solely to increase the wartime production of tents. There is no evidence in this record that Universal ever did anything of this nature, and it is entitled to no credit under this subfactor. The other subfactors and examples listed in *Mason & Hanger-Silas Mason Co., supra,* are likewise inapplicable.

I conclude that Universal is entitled to moderate credit under the factor of contribution to the defense effort as a result of its experimental and developmental work successfully performed.

*Renegotiation Act § 103(e)(2): Net Worth*

Plaintiff argues in its brief that return on net worth is an inappropriate basis for measuring profit in this case. Universal operated as a Subchapter S corporation, leased its production facilities, and invested much of its capital in an intangible asset known as "know-how." The defendant does not suggest otherwise in its brief (in fact, it ignores this factor altogether), and I agree that return on net worth is not helpful in deciding the issue of excessive profits in this case. Accordingly, since the plaintiff does not rely on it and the defendant does not urge it, we decline to apply this factor here.

*Renegotiation Act § 103(e)(1): Reasonableness of Costs and Profits*

This peculiar factor was disposed of by the court in *Camel Mfg. Co., supra,* 215 Ct.Cl. at 509, 572 F.2d at 307, with the following observation:

In many respects, this statutory factor encompasses the ultimate issue which must be decided in a renegotiation case.

Since almost all the subfactors arising under this factor have been discussed in other parts of this opinion, no further discussion of the reasonableness of costs and profits appears necessary.

### III. *Summary*

It was concluded, at the end of part I of this opinion, that a rate of return on sales of about 12% was a reasonable starting point for determining whether Universal's profits were excessive. Universal's rates of return on renegotiable business during the review years, it will be remembered, were 18.46% in 1966 and 23.70% in 1967. All that remains is to apply the statutory factor analysis just completed to the amounts by which the review year profit returns exceed 12%. Does the credit granted Universal under the various statutory factors entitle it to 6.46% additional profit in 1966, and to 11.70% additional profit in 1967?

The decisions of this court adequately reflect the futility in expecting complete mathematical accuracy in such a flexible and uncertain field as renegotiation. While some of the statutory factors may be susceptible of reasonable quantitative determi-

nation, the flexibility required by the Renegotiation Act must find expression in a coherent, eclectic solution. The experience and reasoned judgment of a court are called into play in such a process, and while any available figures and computations may be taken as guidelines, the final resolution of the case must embody a court's smooth integration of all the evidence presented and all the factors weighed. "[A] broad brush approach is appropriate so long as the evidence in the record is sufficient to permit a responsible judgmental adjustment in determining a *reasonable profit for the re*negotiated contractor." *Camel Mfg. Co., supra,* 215 Ct.Cl. at 514, 572 F.2d at 310.

This record is sufficient for such an adjustment. The only piece of quantitative evidence available to us is the plaintiff's calculation of how much money was saved by increased efficiency. It suggested a figure of $500,000. For the reasons explained under my discussion of reduction of costs, I believe that the figure may be somewhat high, and at the very best is an uncertain approximation. The dollar amount by which Universal's profits exceeded those determined to be "normal" in part I is approximately $695,033.

Based on all the evidence, and on the moderate credit I have found Universal entitled to under some (though not all) of the statutory factors and subfactors, I think it is clear that plaintiff should receive a clearance for 1966. Plaintiff proved Universal's entitlement to an extra 6.46% profit for that year.

For 1967 the picture is not quite so clear. I am not inclined to hold that plaintiff proved Universal's entitlement to double its normal profits for this year on the basis of the credit we awarded. While not unmindful of the $500,000 figure mentioned by plaintiff under the efficiency factor alone, I feel that a profit rate on renegotiable sales of 20% fully and adequately compensates Universal for its entitlement to increased credit during 1967. Accordingly, I conclude that Universal realized $183,762 of excessive profits, within the meaning of the Renegotiation Act, during the first 7½ months

of 1967. This amount, less applicable tax credits and plus interest as provided by law, is due the Government.

## CONCLUSION OF LAW

Upon the trial judge's findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court determines that for the fiscal year 1966, Universal Industries, Inc. realized no excessive profits from contracts or subcontracts subject to renegotiation under the Renegotiation Act of 1951, *as amended*, and for that year defendant's counterclaim is dismissed. The court also determines that for the short fiscal year January 1 to August 15, 1967, Universal Industries, Inc. realized from contracts and subcontracts, subject to renegotiation, excessive profits in the gross amount of $183,762. This figure is subject to adjustment according to law for state taxes measured by income and to the statutory credit for federal income taxes, plus interest as provided by law. Judgment is entered for defendant on its counterclaim in an amount to be determined by the trial division under Rule 131(c).